UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT CAYNE and PHYLLIS CAYNE, husband and wife; RONNIE RIVERA, individually; SEAN RIVERA, individually; KEN McELROY and LAURA McELROY, husband and wife; and the same on behalf of themselves and on behalf of all others similarly situated,<br><br>                Plaintiffs,<br><br>vs.<br><br>WASHINGTON TRUST BANK, a Washington corporation; and WEST SPRAGUE AVENUE HOLDINGS, LLC, a Washington limited liability company; and JOHN/JANE DOE I-V,<br><br>                Defendants. | Case No. 2:12-cv-00584-REB<br><br>**AMENDED MEMORANDUM DECISION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## SUMMARY OF THE CASE AND DECISION

Plaintiffs are individuals who bought into an exclusive and expensive golf course development that began to take shape in 2004 on the western shores of Lake Coeur d'Alene, in northern Idaho. Most joining the golf course resort purchased a building lot in the real estate development surrounding the golf course, and a membership in the golf course club itself, known as "the Club at Black Rock." Those interested were required to make an up front payment of a so-called "membership deposit," which increased in amount over time but was always in the tens of thousands of dollars at a minimum and over $100,000 at its most expensive. On top of that, the members paid monthly dues to the golf club.

The Club at Black Rock closed in the late fall of 2010, after it fell into financial distress and several months after defendant Washington Trust, the bank whose loans were secured by the Club's

**MEMORANDUM DECISION AND ORDER - 1**

real and personal property, took over ownership of nearly the entirety of the Club's assets, in a work-out agreement with the Club's developer, Marshall Chesrown.  The Club continued to operate as it had before the change in ownership until the bank sold the golf course to a third-party, and after the members of the Club at Black Rock were informed that the memberships were terminated, and the Club was being closed.

The former members of the Club at Black Rock want a return of their membership deposits. The membership agreement described when, and if, a member was entitled to a refund of the membership deposit.  The former members contend that Washington Trust owes them a refund of those deposits, because Washington Trust assumed that liability when they took ownership of the golf course assets, which included an assignment of the Membership Agreement and related agreements.  Washington Trust vigorously disputes that it has responsibility for the membership deposits, which – depending upon which side answers the question – total approximately $29 million.  Someone in this case will ultimately be left holding that bag.  Right now, it is the former members.  They contend it should be the bank.

Currently pending before the Court are Cross-Motions for Summary Judgment (Dkts. 89, 99) filed by Plaintiffs[1] and Defendants Washington Trust Bank and (its wholly owned subsidiary) West Sprague Avenue Holdings, LLC (sometimes collectively referred to as the "Bank" or "Washington Trust").  For the reasons discussed herein, Plaintiffs' Motion for Summary Judgment is granted in part and denied in part, and Defendants' Motion for Summary Judgment also is granted in part, and denied in part.  In the decision that follows: (1) the Court holds as a matter of law that the Bank took an assignment of the Membership Agreement and related Membership Plan which contain the details of when the members have a right to a refund of their membership deposits; (2) the Court holds as a matter of law that the right to a refund of the membership deposits was

---

[1]  The Plaintiff class is represented by named Plaintiffs Robert Cayne and Phyllis Cayne, Ronnie Rivera, Sean Rivera, Ken McElroy and Laura McElroy.

**MEMORANDUM DECISION AND ORDER - 2**

triggered when the memberships were terminated and the golf course facilities closed to the members; (3) the Court holds as a matter of law that the Bank did not make an express assumption of the liability for the membership deposits, having made express disclaimers of any such type of liability in the work-out agreement; and (4) the Court holds that there are genuine issues of material fact which preclude summary judgment for either side, and which will require resolution at trial, on the remaining ultimate issue of whether the Bank impliedly assumed liability for the membership deposit refunds because of its actions and conduct in the manner in which it took ownership of the Club and its facilities, and in the manner in which the Club continued to operate it until it was ultimately sold.

### PROCEDURAL BACKGROUND AND SUMMARY OF THE CLAIMS AND DEFENSES

Plaintiffs filed their lawsuit in Idaho state court, after which Defendants removed it to this Court.  Plaintiffs brought three claims for relief: (1) breach of contract (as to the Membership Agreement and Membership Plan); (2) misrepresentation and/or constructive fraud; and (3) violation of the Idaho Consumer Protection Act ("ICPA").  (Dkt. 1-1.)  Defendants filed a Motion for Judgment on the Pleadings, which was denied as to the breach of contract claim.  The constructive fraud/misrepresentation claim and the ICPA violation claim were dismissed, but with leave to amend.  (Dkt. 13.)  Plaintiffs did not seek to amend the dismissed claims.

The parties stipulated to class certification (Dkt. 54), which was the subject of the Court's December 11, 2013 certification order (Dkt. 57).  The pending cross-motions for summary judgment followed, and argument was heard upon the same in Coeur d'Alene on May 5, 2015.

The now-defunct Club at Black Rock (the "Club") was marketed to be a world-class golf resort and residential community for the wealthy, located on the edge of Lake Coeur d'Alene in Northern Idaho. During its development, the legal entity that owned the Club assets and operated the

**MEMORANDUM DECISION AND ORDER - 3**

Club was the "Club at Black Rock, LLC" (the "LLC").[2]  The LLC borrowed more than $12 million in various loans from Washington Trust Bank, secured by various assets, including the real and personal property connected with the operation of the Club.[3]  By late 2010, the LLC was in significant financial distress, and facing the threat of foreclosure.  The Bank was concerned about its collateral, because of the length of time required to pursue such a foreclosure, and because there were other unpaid creditors.  The possibility of an involuntary bankruptcy also loomed, and in either scenario the Bank was concerned that the golf club would be shut down, a result which the Bank feared would greatly diminish the value of its primary piece of collateral.  To avoid such an end, the Bank sought and obtained a work-out agreement with the LLC by which the Bank accepted a deed in lieu of foreclosure in order to obtain immediate possession and ownership of the secured real estate and improvements, and by which the Bank also obtained immediate possession and ownership of the associated personal property, chattels and paper through a bill of sale.  The Bank released the LLC from any possible deficiency and released Marshall Chesrown from his personal guarantee upon the largest of the unpaid loans.  The deed in lieu of foreclosure, and its related bill of sale agreement, were entered into on August 11, 2010. From that date the Bank was the owner of all that used to be the Club at Black Rock, previously operated by the LLC.

---

[2]  For clarity, the Court will use "the LLC" to refer to the legal entity.  It will use "the Club" to refer to the golf course and related facilities.

[3]  The record contains various information about the nature of the loans made to the LLC, and the attenuated connection between the loans and the LLC.  There appears to be no disagreement that the loan proceeds were not used exclusively on assets of or improvements to the Club, but rather in large part upon other ventures being pursued by the primary principal of the development and its related operations, Marshall Chesrown.  Similarly, there does not appear to be any disagreement as to the fact that value of the security interests held by the Bank in the assets of the LLC, at least at the time of the defaults upon such loans and the time period involved in this dispute, fell short of the amount of the total indebtedness.  The Bank officials said that they were making such large loans to Chesrown's business interests in part upon his "global cash flow."  *See* Francis Decl. Ex 4, Perko Dep. 253:14-18; Burnside Decl. Ex. 15, Heath Dep. 80:18-22.

**MEMORANDUM DECISION AND ORDER - 4**

As the workout agreement was being negotiated and in the months that followed its completion, the Bank actively sought to sell the Club as a going-concern.  The Club remained open through the remainder of the 2010 summer and fall golfing season, before being closed on October 31, 2010.  Contemporaneously with its closure the Bank sold the Club to a third-party, which took the name "The Golf Club at Black Rock, LLC."  Before the new owner re-opened the doors to the golf course under its ownership, the Plaintiffs received a letter informing them that the Club was "terminating all membership agreements effective at 5:00 p.m. on October 31, 2010."  Springel Decl. Ex. ZZ.

The Plaintiffs contend that the Bank had assumed the duties of the LLC in the operation of the Club -- including the LLC's duties under the Membership Agreement -- as a result of the assignment of that contract from the LLC to the Bank.  The Plaintiffs further contend that closure of the Club and the termination of the memberships triggered the duty to refund the membership deposits  under the Membership Agreement and its related Membership Plan, and that under the applicable agreements between the Plaintiffs and the LLC and the applicable agreements between the LLC and Washington Trust, Washington Trust became responsible to refund the membership deposits.  Washington Trust disputes any such liability, arguing that the agreements it had between itself and the LLC expressly disclaimed the possibility of any such liability and that it did not take on such a liability, either expressly or impliedly.

## STATEMENT OF FACTS

**A.      The Development and Financing of The Club at Black Rock, LLC**

1.      Developer and managing member Marshall Chesrown created the Club at Black Rock, LLC (the "LLC") to develop, own, and operate a private golf club named the Club at Black Rock (the "Club") to promote his contemporaneous development of luxury home sites along the golf course

**MEMORANDUM DECISION AND ORDER - 5**

and Lake Coeur d'Alene in Idaho.[4]  He had a 99% interest in the LLC.  Defs.' SOF ¶ 2; Burnside

Decl. Ex. 12, Chesrown Dep. 11:24-12:1, 12:13-24, 101:24-102:1, 146:10-14.

2.      Between 2004 and 2010, Washington Trust made four loans to the LLC amounting to

over $12 million.  These loans were secured by a deed of trust on the golf course and club house,

and security interests in its equipment, vehicles, boats, trailers, inventory, equipment, furniture,

fixtures and accounts receivable.  Mr. Chesrown personally guaranteed the first loan, made in June

2004, of $10 million.[5]  Defs.' SOF ¶ 10;  Oberst Decl. ¶¶ 3-4, Ex. 21, Ex. 23, Ex. 24, Ex. 25, Ex. 26,

Ex. 27, Ex. 28, Ex. 29, Ex. 30, Ex. 31; Perko Dep. 195:5-13, 207:18-20; 253:16-18; Chesrown Dep.

114:18-116:1; 153:19-154:1, 155:3-156:8 ; Heath Dep. 80:18-22, 175:15-21, 192:19-193:2, 193:7-

10; Burnside Decl. Ex. 16, Oberst Dep. 297:24-298:6; Springel Decl. Exs. H-M, Ex. D, Perko Dep.

17:16-18:4.

**B.      Membership in the Club at Black Rock**

3.      The Membership Agreement was a contract between each member and the LLC, whose

rights and obligations were also governed by the incorporated Membership Plan.  *See* Membership

Agreement (Dkt. 92-1).

4.      The Membership Plan described the membership amenities at the Club, including the

Club facilities, Club operations, membership rights, and dues and charges.  Membership Plan (Dkt.

92-1).

5.      The Agreement required each member to pay a membership deposit (this ranged

from $40,000 to $125,000, increasing in amount as the number of members grew) and monthly dues

---

[4]  To repeat, the Club at Black Rock, LLC was the legal entity that developed the Club at
Black Rock.  The "LLC" refers to the legal entity.  The "Club" refers to the golf course and
related facilities.

[5]  Washington Trust Relationship Manager Mark Perko testified that the primary source
of repayment for the 2004 loan was intended to come from "[s]ources of cash generated by the
club" and "Mr. Chesrown's personal financial statement."  Pls.' SOF ¶ 13; Perko Dep. 20:15-20,
40:2-11.

**MEMORANDUM DECISION AND ORDER - 6**

and charges in exchange for use of the Club's facilities.[6]  Defs.' SOF ¶ 3; Pls.' SOF ¶ 3.

6.       Members were entitled to a refund of the Membership Deposit within thirty days of the

following: (1) termination of the Membership Plan; (2) termination of any category of membership;

or (3) the discontinuance of operation of all or substantially all of the Club facilities.  Membership

Agreement, p. 4.  *See also* Membership Plan, p. 14.

7.       The Membership Agreement provided that: "In the event that the Club facilities are sold and

the buyer assumes liability for the repayment of the Membership Deposit, the [member] shall look

solely to the new for owner for repayment of the Membership Deposit and the seller shall be

released from all liability for the repayment thereof.  In the event of a sale of the Club facilities, the

buyer shall take title subject to the terms and provisions of the then existing Membership Plan."

Membership Agreement, p. 4.   *See also* Membership Plan, p. 14.

8.       The members of the Plaintiff class are all former members of the Club.  Defs.' SOF  ¶ 1;

Pls.' SOF ¶ 1.

9.       Dean Oberst, Commercial Special Assets Manager at Washington Trust, was aware of the

Membership Agreement and Membership Plan.  Dean Emmanuels, Washington Trust Vice

President and Chief Appraisal Officer, knew the deposits were refundable.  Pls.' SOF ¶ 16, ¶ 38;

Springel Decl. Ex. E, Emmanuels Dep. 132:2-17; 156:6-157:8; 164:3-165:6; Ex. F, Oberst Dep.

27:8-15; 31:13-32:12; 85:11-25.

**C.       Financial Difficulties Surrounding the LLC and Related Chesrown Entities**

10.       Between 2004-2009, the LLC operated at multi-million dollar annual operating losses.

Defs.' SOF ¶ 7; Pls.' SOF ¶ 26; Perko Dep. 30:4-23; 90:1-7; Springel Decl. Ex. G, Von Buchwaldt

Dep.  65:21-24; Ex. O; Ex. X.

11.       From 2003 to 2010, the LLC listed "Club Member Deposits" as a long-term liability on its

---

[6]  Plaintiffs contend that the membership deposits ranged from $5,000 to $175,000 and
cite to Plaintiff's Ex. BBB in support.  For purposes of this motion, the exact amount of the
membership deposits is not relevant.

**MEMORANDUM DECISION AND ORDER - 7**

balance sheet.  By March 31, 2010, the liability was calculated at $ 29,505,182.00.  Defs.' SOF ¶ 6; Oberst Decl. ¶ 8, Ex. 39; Burnside Decl. Ex. 14, Rountree 1st Dep. 39:2-13.

12.     In 2009, Washington Trust purchased the Black Rock marina and beach/sales office properties used by Club members.  These properties previously were owned by other Chesrown-owned entities, and not the LLC.  Washington Trust President Jack Heath testified that these properties were purchased because aggregating the real estate would make it more valuable.  Pls.' SOF ¶ 29; Springel Decl. Ex. N, Chesrown Dep. 146:23-148:1; Ex C., Heath Dep. 85:4-86:24, 216:5-16.

13.     In the summer of 2010, the LLC solicited Club members to serve on a long-range planning committee, to advise it and Club members on options for restructuring.  Defs.' SOF ¶  12;  Francis Decl. Ex. 7

14.     In letters to Club members in 2010, the long-range planning committee recommended that the best solution would be to convert the Club to a member-owned club.  However, the LLC and Club members could not agree on how this should occur.  Chesrown testified that his priority was for the Club to remain open and that was a prerequisite to any deal he would agree to.  Defs.' SOF ¶¶ 13-14;  Francis Decl. Exs. 8-9; Oberst Decl. ¶ 7; Oberst Dep. 86:14-24, 87:22-88:23; Heath Dep. 153:23-154:2 ; Burnside Decl. Ex. 6, Gorton Dep. 43:3-22; Chesrown Dep. 134:23-136:15.

15.     At this time in 2010, the LLC had a number of unpaid creditors.  Also in 2010, Washington Trust became concerned about the possibility of an involuntary bankruptcy originating with other creditors that the Bank believed could cause "significant delay to preserving the asset" (that is, Washington Trust's security for its unpaid loans).  Pls.' SOF ¶ 37;  Perko Dep. 55:7-10, 57:18-25; Oberst Dep. 55:19-56:4, 61:18-62:5; Oberst Decl. ¶ 7 ("the Bank did not want to proceed with bankruptcy or foreclosure because both can take months or years to complete . . . [t]o achieve a faster resolution than bankruptcy or foreclosure would allow, and to best protect the value of the collateral, the Bank agreed to executed a deed in lieu of foreclosure."); Heath Dep. 178:17-20 ("the

**MEMORANDUM DECISION AND ORDER - 8**

decision to take the deed in lieu of foreclosure" was because "we [didn't] have to go through an extended foreclosure process.")

16.     Washington Trust, as reflected in internal memoranda, believed that "preservation of the membership base" was critical to the Club's value and that there would be more value if there were active members interested in buying the Club.  Pls.' SOF ¶ 34; Defs.' SOF ¶¶ 15-16; Heath Dep. 156:6-12; Springel Decl. Ex Y.

17.     Washington Trust knew it could "let the golf course go to seed," but believed that doing so would make the asset worth much less.  On the other hand, the Bank believed that keeping the golf course open and maintained would preserve its value.  Pls.' SOF ¶ 33; Defs.' SOF ¶ 16; Heath Dep. 43:21-45-7; Oberst Dep. 86:18-24.

**D.     Deed in Lieu of Foreclosure**

18.     To avoid the prospect of either a voluntary or involuntary bankruptcy, and to protect against foreclosure and a possible deficiency, Washington Trust and the LLC agreed to a work out of the unpaid loans which included an Agreement for Deed in Lieu of Foreclosure ("DIL Agreement"), an accompanying Non-Merger Warranty Deed in Lieu of Foreclosure ("Warranty Deed"), and a Bill of Sale and Assignment ("Bill of Sale").   These agreements were executed effective August 11, 2010. Defs.' SOF ¶ 17; Oberst Decl. ¶ 7; DIL Agreement, Non Merger Warranty, Bill of Sale (Dkt. 92-2--3).

19.     The DIL Agreement released the LLC from its indebtedness on the four outstanding loans secured by the golf club's real and personal property.  The Bank also agreed to release Chesrown from the individual guaranty he made on the $10 million loan in 2004.  The Warranty Deed transferred the real property to the Bank and the Bill of Sale transferred the associated personal property to the Bank, as detailed more specifically below.  *Id.*

20.     The LLC's 2010 Tax Return reported nearly $28 million in "Cancellation of Debt" income related to the membership deposits as a result of the DIL Agreement.  Pls.' SOF ¶ 56; Springel Decl.

**MEMORANDUM DECISION AND ORDER - 9**

Ex. AAA.

21.     In the DIL Agreement, Washington Trust and the LLC agreed that "transfer of the Property[7] to [Washington Trust] in lieu of foreclosure is necessary to allow for continued operation of the Club as set forth in Section 6.3."  DIL Agreement Recital G.

22.     Section 6.3 of the DIL Agreement, titled "Post-Closing Obligations," provided that after the Closing, the Bank was required to: "reasonably endeavor to continue stabilized operations of the Club, at least through the 2010 season, at a level of service and amenities that is consistent with the prior operation of the Club, provided that the membership is maintained with a sufficient number of dues paying members to sustain operation of the Club as reasonably determined by [Washington Trust]."  DIL Agreement § 6.3.

23.     In a provision addressing representations and warranties made by the LLC to the Bank, Section 7.4 reads: "[The LLC] acknowledges and agrees that acceptance by [Washington Trust] of title to and [the LLC's] interest in the Property pursuant to the terms of this Agreement shall not create any obligations on the part of [Washington Trust] to third parties that have claims of any kind whatsoever against [the LLC] with respect to the Property and that [Washington Trust] does not assume or agree to discharge any liabilities pertaining to the Property that occurred prior to the date of Closing, except as specifically assumed by [Washington Trust.]  The [LLC] agrees to indemnify and hold [Washington Trust] free and harmless from and against any losses, damages, costs, or expenses, including attorneys' fees, pertaining to claims and liabilities relating to the Property, resulting from events that occurred prior to the date of Closing.  No person not a party to this

---

[7] The "Property" included both the "Real Property" and "Personal Property."  DIL Agreement, Recital C.  The Real Property was defined as "NNA, Coeur d'Alene, Idaho, 83814, Parcel Nos. 0-0770-000-00A-0, 0-0770-000-00A-B, 0-0778-000-00C-A, 0-0778-000-00C-B, 0-0776,008-001,A, 0-0770-000-00C-C."  DIL Agreement, Recital A.  The Personal Property was defined as: "any and all Equipment, Inventory, Chattel Paper, Accounts, General Intangibles, Furniture, Fixtures, Vehicles, and Vessels, including any and all food, wine, and beverage inventory, as more particularly described on Exhibit B."  *Id.*, Recital B.

**MEMORANDUM DECISION AND ORDER - 10**

Agreement shall have any 'third-party beneficiary' or other right hereunder."  DIL Agreement

§ 7.4.

24.     Section 9.10 of the DIL Agreement, titled "No Partnership," described the "relationship

between [Washington Trust] and [the LLC] is that of debtor and creditor.  Nothing contained in this

Agreement will be deemed to create a partnership or joint venture between [Washington Trust] and

[the LLC], or between [Washington Trust] and any other party, or to cause [Washington Trust] to be

liable or responsible in any way for the actions, liabilities, debts, or obligations of [the LLC]."  DIL

Agreement § 9.10.

25.     Section 9.12 was titled "No Third-Party Beneficiaries" and reiterated the language of the last

sentence of Section 7.4: "The provisions of this Agreement are solely for the benefit of [Washington

Trust] and [the LLC], and do not inure to the benefit of, or confer rights upon, any third party."  DIL

Agreement § 9.12.

26.     The Bill of Sale and Assignment, executed contemporaneously with the DIL Agreement,

served to "grant, bargain, sell, convey, assign, and transfer unto [Washington Trust]" the following:

"All Equipment;" "All inventory, chattel paper, accounts, furniture, and all fixtures, excluding

Alcoholic Liquor as defined in Idaho Code 23-105;" . . . "All deposits and bonds of the Club;" . . .

"All assignable permits, *licenses, contracts*, approvals, applications and *agreements*, *of every kind

and nature*, relating to the Club, including, without limitation, all building permits and

environmental and subdivision approval; but excluding any permits and licenses relating to

Alcoholic Liquor as defined in Idaho Code 23-105. . ."  Bill of Sale (emphasis added).  There is no

reference in any of the conveyance agreements that  address by specific name the membership

deposits that are referenced in the Membership Agreement; however, neither is there any reference

in the conveyance agreements that specifically indicates by name that the Membership Agreement is

*not* one of the agreements otherwise included in the above described paragraph from the Bill of Sale.

27.     Washington Trust President Heath testified that the Bank "took the things that were required

**MEMORANDUM DECISION AND ORDER - 11**

to operate the Club. . ." Pls.' SOF ¶ 50; Heath Dep. 111:1-5.

28.     Section 5.2 required that the LLC deliver, at closing, all insurances policies, all keys to access the Property, and all Certificates of Title to Property.  DIL Agreement § 5.2.

29.     Section 2.1(c) confirmed that, upon a default, the various security agreements gave Washington Trust the power to deal with "the Personal Property" in Washington Trust's own name or that of the LLC.  DIL Agreement § 2.1(c).

30.     Section 2.2 stated, in part: "The [LLC] should have no further interest or claim in or to the Personal Property conveyed by the Bill or Sale and Assignment, or the proceeds or profits of any kind whatsoever which may be derived from the Personal Property."  DIL Agreement § 2.2.

31.     The Deed in Lieu Agreement, and related documents (including the Warranty Deed and Bill of Sale), were executed on August 11, 2010.  Pls.' SOF ¶ 48; Defs.' SOF ¶ 17.

32.     On August 23, 2010, Washington Trust assigned the assets transferred by the LLC to its wholly owned subsidiary, West Sprague Avenue Holdings, LLC. Pls.' SOF ¶ 49; Defs.' SOF ¶ 19; Springel Decl. Ex. YY.

**E.      The Operation of the Club After Execution of the DIL Agreement**

33.     At Washington Trust's request, Black Rock Development[8] assigned Washington Trust its declarant's rights to the Black Rock Homeowners' Association ("HOA").  Pls.' SOF ¶ 52; Oberst Dep. 39:16-40:17; 42:21-43:12.

34.     Dean Oberst, Special Assets Manager and Washington Trust, said the assignment of the HOA's declarant rights was important to the Bank for two reasons: (1) if the Bank was the declarant, it would not be charged HOA dues and (2) a potential buyer would interested in "getting all of the rights that are available".  Pls.' SOF ¶ 52; Oberst Dep. 39:16-43:20.

---

[8]  Black Rock Development was a separate and distinct entity from the LLC and the Club at Black Rock.  It was also owned by Chesrown. It had no loans or collateral with Washington Trust.

**MEMORANDUM DECISION AND ORDER - 12**

35.     Following this, the former HOA board members,[9] who had been appointed by Chesrown, resigned.  In their place, Washington Trust appointed persons it controlled – Oberst, Julie Shiflett[10] and Clay Hatch[11] – to the HOA's Board of Directors. Pls.' SOF ¶ 53; Springel Decl. Exs. DD, EE.

36.     After the DIL Agreement and related agreements were executed, Washington Trust sought a third-party management company to run the Club because "...the Bank is in the business of banking, not golf course management."  However, the Bank could not find a willing third-party management company to operate the Club.  Pls.' SOF ¶ 58; Oberst Dep. 104:11-106:5; Oberst Decl. ¶ 9 ("...the Bank is in the business of banking, not golf course management"); Heath Dep. 42:12-13 ("We are a financial institution").

37.     Washington Trust decided to use members of the preexisting management team (who had operated the Club as employees of the LLC) to manage and conduct golf club operations.    This arrangement continued through October 31, 2010, when the Club was shut down.  Pls.' SOF ¶ 59; Oberst Dep. 104:11-19, 110:24-111:20.

38.     As part of that decision by the Bank, Andy Gorton, who previously had been general manager of the Club, continued to oversee daily operations.  Pls.' SOF ¶ 64; Springel Decl. Ex. HH, Gorton Dep. 14:8-15:13, 17:19-18:14.

39.     Because Chesrown (the former owner) no longer had any involvement in the Club,[12] Gorton believed that he needed a written agreement that allowed Gorton and his colleagues to operate the

---

[9]  These were Chesrown, Chad Rountree and Nancy Nick.  Springel Decl. Ex. DD.  Chad Rountree was the LLC's CFO.  According to the Membership Plan, Nancy Nick was the Membership Director.

[10]  Shiflett was a consultant for the Bank, whose role is discussed in more detail *infra*.

[11]  Hatch was a Washington Trust employee.

[12]  *See* Facts ¶ 45, *supra*, in which Chesrown testified that he no longer had any involvement with the Club after the DIL Agreement.

**MEMORANDUM DECISION AND ORDER - 13**

Club going forward.[13]  An agreement was drafted, but not signed, and Gorton and his colleagues ran the Club under a verbal agreement with the Bank.  After the DIL Agreement was signed, Gorton managed and operated the facilities for the benefit of the members, in the same manner as had been done prior to the DIL Agreement.  This included paying the bills, maintaining all the contracts for landscaping, equipment maintenance, stocking supplies for the golf course, paying any accounts payable, performing appropriate repairs and the like.  Pls.' SOF ¶¶ 65-66; Gorton Dep. 134:9-135:23, 139:1-147:9.

40.    Any unpaid accounts of the 200 some vendors of the Club at the time the DIL Agreement was signed were paid in full, as were any expenses that were incurred afterwards.  Pls.' SOF ¶ 78; Gorton Dep. 89:19-91:5.

41.    Following the DIL, the Club continued to operate as if there was no change in ownership. Members could still golf and use the spa and gym, among other amenities.  Pls.' SOF ¶ 77;  Gorton Dep. 49:20-24; Burnside Decl. Ex.14, Rountree 1st Dep. 181:17-24.

42.    Heath, the President of Washington Trust, was also a member of the Club.[14]  He testified that the Club continued as normal and "as a member it didn't appear that there were any changes." Heath Dep. 93:18-94:8, 95:15-20, 115:22-116 :1.  He continued to be charged dues.  *Id.*

43.    Revenue totaling $1,898,211.32 was collected from August 11, 2010 until year end.  At a minimum, inferences can be drawn from the record that the revenue belonged to the Bank, but was deposited into the LLC's checking account and used to pay Club expenses from that account.  (The Bank controlled the LLC account, having been assigned the account – held at Washington Trust – as

---

[13]  Although a written agreement was never signed, one was drafted.  Washington Trust attorney, Thomas Bassett, testified that the purpose of the written agreement was to guarantee that someone was there to manage the facilities because ownership had changed hands.  Pls.' SOF ¶ 61; Springel Decl. Ex. BB, Bassett Dep. 56:13-57:15.

[14]  In addition to Heath, Washington Trust Board Chairman Peter Stanton was also a member of the Club.

**MEMORANDUM DECISION AND ORDER - 14**

part of the DIL and other conveyance agreements.)  This revenue primarily consisted of receipt of member dues and charges.  Pls.' SOF ¶ 79; Chatters Decl. ¶ 7; *see* Rountree 1ˢᵗ Dep. 102:5-12. The Bank contends "it was employees of Debtor and Debtor's affiliated entities, alone, [who] billed members for monthly dues and collected member dues . . . [t]hese employees deposited this money in Debtor's bank accounts.  The Bank contends that it had no authority to sign Debtor's checks, did not receive club member checks, and did not decide to whom Debtor would cut checks or what bills to pay."  Defs.' SOF ¶ 21.

44.    Post-DIL,[15] memberships were suspended if the members did not pay their dues.  Pls.' SOF ¶ 84; Gorton Dep. 67:25-68:4, 179:14-25.

45.    Marshall Chesrown was not involved in Club operations post-DIL.  He did not have communication with the persons working at the Club.  He said that any employees were not his.[16]

---

[15]  The Court uses the phrase "post-DIL" to refer to the time period from August 11, 2010, when the DIL transaction closed, to October 31, 2010, when the Club facilities were closed.

[16]  Chesrown's deposition was taken on November 4, 2014.  On January 16, 2015, in connection with Defendant's Motion for Summary Judgment, Chesrown submitted a declaration in which he stated: "After the DIL, the existing management team and Debtor's [the LLC] existing employees continued to maintain the golf course and operate the golf club through the end of the 2010 season (October 31, 2010).  These employees (both management and staff) were never Bank employees - they were exclusively employees of the Debtor or one of my other entities." Chesrown Decl. ¶ 2 (Dkt. 93).
     "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 852 F.2d 262, 266 (9th Cir. 1991).  The reasoning behind such a rule is, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of facts."  *Id.*  However, the rule should be applied with caution.  For that reason, two important limitations exists.  First, the sham affidavit rule "does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony . . . rather the district court must make a factual determination that the contradiction was actually a "sham."  *Id.* at 266-67. Second, the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.  Minor inconsistencies that result from an honest discrepancy or mistake afford no basis for excluding an affidavit.  *See Messick v.*

**MEMORANDUM DECISION AND ORDER - 15**

Pls.' SOF ¶ 62; Chesrown Dep. 178:18-25; 209:11-210:1.

46.     On September 1, 2010, Washington Trust contracted with "CFO Outsourcing, LLC" to provide the services of Julie Shiflett, whose job was to provide Washington Trust with recommendations and advice on how to "preserve the asset [that is, the Club]." Defs.' SOF ¶ 25; Pls.' SOF ¶¶ 70, 72, 73; Oberst Decl. ¶ 11; Springel Decl. Ex. MM, Shiflett Dep. 31:16-32:7.

47.     According to Shiflett, "having an ongoing club helps preserve the value of the asset . . . any business is more valuable if it's ongoing and has ongoing activities than if it's dormant.  So having an ongoing, active club . . . helps with the value of the real estate."  Pls.' SOF ¶ 72; Shiflett Dep. 31:16-32:7.

48.     Shiflett recommended what expenses of the Club should be paid, based on cashflow inflows and shortfalls between revenue and expenses (including pre-DIL expenses). Shiflett could not demand that Washington Trust add money into the LLC account.  Pls.' SOF ¶ 72; Shiflett Dep. 40:15-41:4; 97:7-17.

49.     In less than three months, Washington Trust added between $445,402.11 and $ 721,362.53 of the Bank's money to pay for Club expenses, by placing various internal transfers into the LLC bank account between August 11, 2010 and October 29, 2010.[17]  Defs.' SOF ¶ 23; Pls.' SOF ¶¶  71,

---

*Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).

     Chesrown's affidavit does not seek to clear up a mistake or discrepancy, nor is it a minor inconsistency.  In Chesrown's deposition, he was asked if the [employees] continued to be his (meaning the LLC's) employees. His response: "No.  I had no communication with them at all." Chesrown Dep. 178:18-25.  Chesrown's declaration directly contradicts this testimony, stating "These employees were never Bank employees – they were exclusively employees of the [LLC] or one of my other entities."  This is not a minor inconsistency nor is it ambiguous.  In his deposition, Chesrown swears under oath that the employees who continued on at the Club were not his.  In his declaration, Chesrown states they were employees of one of his entities.  This is a direct contradiction.  To the extent that ¶ 2 of the Chesrown Declaration creates an issue of fact, it is striken from the record.

     [17]  There is a discrepancy between the parties' statement of facts and the record as to how many dollars Washington Trust (including West Sprague) transferred to the LLC.  Although it is a rather large discrepancy, the exact amount is not material for this decision.  What is material is

**MEMORANDUM DECISION AND ORDER - 16**

75 Oberst Decl. ¶ 10, Ex. 40;  Shiflett Dep. 40:15- 41:4; Oberst Dep. 129:6-11.

50.     After the DIL Agreement was signed, 134 payments totaling $325,710.72 were made from the LLC's checking account to vendors of the Club for pre-DIL invoices.  Pls.' SOF ¶ 91; Chatters Decl. Ex. A.

51.     Sales taxes for pre-DIL sales were also paid post-DIL.  Pls.' SOF ¶ 82; Rountree 1st Dep. 227:15-229:25.

**F.     A New Owner Purchases the Club at Black Rock from Washington Trust**

52.     Washington Trust sold the Club to "The Golf Club at Black Rock, LLC," ( the "New Buyer") an entity formed by ten members of the previously existing Club at Black Rock. The purchase price was $6 million.  The sale was accomplished through an "Asset Purchase Agreement," which closed on November 1, 2010.  Defs' SOF ¶ 26; Oberst Decl. ¶ 12, Ex. 43.

53.     The New Buyer would not purchase the Club with the existing Membership Plan (and related Membership Agreements) in place.  Therefore, the New Buyer made the termination of any preexisting memberships a condition of purchase.  Pls.' SOF ¶ 90; Francis Decl. Ex. 10, Magnuson Dep. 34:14-23; Oberst Dep 161:19-24.

54.     The New Buyer's attorney, John Magnuson, testified that Washington Trust "was always consistent [in saying] that [it] did not have the ability to terminate the plan . . ."  Magnuson did not care who terminated the memberships, but required that it be done in order to have a "clean slate." Magnuson Dep. 126:10-22.

55.     On October 29, 2010, Marshall Chesrown, purporting to act by authority as the managing member of The Club at Black Rock, LLC, sent a letter to the members of the Club at Black Rock notifying them that effective October 31, 2010 at 5:00 p.m., all membership agreements would terminate and the Club facilities were closed effective that date.  Pls.' SOF ¶ 95; Springel Decl. Ex.

---

that Washington Trust was depositing substantial sums of money into the LLC's bank account to cover expenses to operate the Club.

**MEMORANDUM DECISION AND ORDER - 17**

ZZ.

56.     Beginning on November 1, 2010, anyone who wanted to use the club facilities at the golf course had to purchase a new membership with the new entity, The Golf Club at Black Rock, LLC, pay a deposit and sign a new membership agreement.  Pls.' SOF ¶ 96; Springel Decl. Ex. WW, Magnuson Dep. 33:16-34:9.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute as to a *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *See id*. at 255.  Direct testimony of the non-movant must be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When parties submit cross-motions for summary judgment, the Court must consider each party's evidence, regardless under which motion the evidence is issued.  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).  The Court must independently search the record for

**MEMORANDUM DECISION AND ORDER - 18**

factual disputes. *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir.2001). The filing of cross-motions for summary judgment—where both parties essentially assert that there are no material factual disputes—does not vitiate the court's responsibility to determine whether disputes as to material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To carry this burden, the moving party need not introduce any affirmative evidence, but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).  This then shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324.

## ANALYSIS AND HOLDINGS

Plaintiffs bring a single breach of contract claim.  Plaintiffs allege they are entitled to a refund of their membership deposits from Washington Trust, under the terms of the Membership Agreement and Membership Plan stemming from the termination of their Club memberships on October 31, 2010.  Plaintiffs contend the Bank is in breach because Plaintiffs never received a refund.  The Bank contends that the Plaintiffs have no right of refund, or in any event, certainly no right of refund from the Bank.

The pending motions are resolved if the record establishes as a matter of law that the Bank assumed, or did not assume, the obligation to refund the membership deposit.  The Court, for reasons discussed below, finds that some of the issues raised by the cross-motions for summary judgment are appropriate for judgment as a matter of law, but that there are genuine issues of material fact that preclude summary judgment for either party as to the ultimate question of whether

**MEMORANDUM DECISION AND ORDER - 19**

the refund obligation under the Membership Agreement was impliedly assumed by Washington Trust.

**A.     The Applicable Burden of Proof.**

The parties disagree over the appropriate standard of proof in this case.  The Bank contends that Plaintiffs must prove "by clear and unequivocal evidence" that Washington Trust assumed the refund liability, relying upon *Murr v. Selag*, 747 P.2d 1302 (Idaho 1987).  Plaintiffs contend that the burden of proof is a preponderance of the evidence.

This Court has previously held that the interpretation of the DIL Agreement is governed by Washington law.[18]  The Idaho case cited by Defendants, *Murr v. Selag*, does indeed hold that an assignee's assumption of an assignor's liabilities must be proved clearly and unequivocally.  747 P.2d at 1309.  However, the DIL Agreement is not governed by Idaho law and even though the *Murr* decision draws upon a Washington case, *People's Savings & Loan v. Cram*, 19 P.2d 667 (Wash. 1933), in making its holding, the actual holding of *People Savings & Loan* is inapposite in its facts.

Rather, the pertinent holding in *People Savings and Loan* is tied to real property mortgages and emphasizes that as to a preexisting mortgage debt, an "obligation of a grantee to assume and pay a mortgage debt need not be expressed in any particular language, but it must unequivocally show his undertaking to be answerable for it."  *Id*. at 667.  The only other Washington court addressing *People Savings & Loan* (and indeed the only other decision besides *Murr* to reference it) is *Perkins v. Brown*, 38 P.2d 253 (Wash. 1934), also a case considering whether a mortgage debt has been assumed.  *Id*. at 256.  Whatever the peculiarities of those early decisions, which dealt with a principle now long embedded in real property conveyance law, there is nothing that this Court gleans from the holdings in those cases (and Defendants offer no other authority for their position)

---

[18]  In an earlier order, the Court also held that Idaho law applied to the Membership Agreement.  (Dkt. 37.)

**MEMORANDUM DECISION AND ORDER - 20**

that imposes a heightened burden of proof upon cases involving non-mortgage debt liabilities.

Hence, the  Court finds, based upon the referenced cases, that the "clear and unequivocal" standard

is limited to the assumption of a mortgage debt.  Accordingly, the burden of proof which Plaintiffs

must meet in order to prevail on their claim is a preponderance of the evidence.

**B.**     **Defendants Did Not Pursue Article 9 Remedies, and Plaintiffs Bring a Breach of Contract Claim, Not an Equitable Claim, but the General Principles of Successor Liability Are Still Applicable to This Case.**

      **1.**     **The Bank Chose to Go Around Statutory Foreclosure Procedures**

The Bank brings Article 9 of the Uniform Commercial Code into its general arguments

about not having any liability for refunding the membership deposits.  There is language in Article 9

which codifies common law protections against successor liability, and there are other provisions of

Article 9 that apply as a general matter to the original lending transactions between the Bank and the

LLC and the collateral taken as security for such loans in the context of how the loans were made

and how the security was perfected, and so forth.

However, the Bank would analyze the facts of this case as if the Bank had realized on its

collateral under the UCC, thus entitling itself to the statutory protections against successor liability

that might exist in that setting.[19]  However, the Bank did not follow UCC remedies.  It diverted from

---

    [19]  Washington Trust also seeks refuge in § 9-402, which provides that the "existence of a security interest, agricultural lien, or authority given to a debtor to dispose of or use collateral, without more, does not subject a secured party to liability in contract or tort for the debtor's acts or omissions."   The statute only addresses the existence of a security interest (or other lien). The DIL Agreement and related documents (Warranty Deed and Bill of Sale) did not create security interests.  Rather, they were documents that "granted, bargained, sold, and conveyed" the LLC's real property and personal property to Washington Trust – dispensing, as it were, of security interests held by the Bank in a manner that transferred ownership of such property to the Bank, for the convenience of the Bank and in a manner intended to operate outside of the statutory process.  After the DIL Agreement, Washington Trust did not have a "mere" security interest that would not subject them to liability under § 9-402.  In that sense, the DIL Agreement and related documents arguably fit in the "without more" identified in § 9-402 as the exception

**MEMORANDUM DECISION AND ORDER - 21**

doing so.  There is no indication in the record that the Bank took the sorts of steps that would characterize such a process – such as notice to other creditors, pursuing a commercial reasonable sale, or meeting the requirements of Idaho law for foreclosure on real property.[20]  Even the title of the main agreement – the "Deed in Lieu of Foreclosure" -- is an indication that the Bank did not pursue foreclosure.

As discussed *supra*, the Bank officers themselves acknowledge that the Bank did not pursue a UCC foreclosure course.  Bank President Jack Heath testified that the reason the Bank made "the decision to take the deed in lieu of foreclosure" was so that "we don't have to go through an extended foreclosure process."  (Heath Dep. 178:17-20.)  Dean Oberst corroborated that view, saying that "the Bank did not want to proceed with bankruptcy or foreclosure because both can take months or years to complete....[t]o achieve a faster resolution than bankruptcy or foreclosure would allow, and to best protect the value of the collateral, the Bank agreed to execute a deed in lieu of foreclosure."  (Oberst Decl. ¶ 7.)

In their motion, Defendants state they proceeded under UCC § 9-604 (RCW 62A.9A-604; I.C. § 28-9-604).  This provision merely permits a secured party to make a choice, when a security agreement covers both real and personal property, to move against the security either (1) under Article 9 as to the personal property or (2) under real property law as to both the real and personal property.  This is not a right of remedy (as compared, for instance, to repossession or foreclosure[21]);

to the general rule.

[20]  For example, RCW 62A.9A-621 and I.C. § 28-9-621 each require that notification be given to certain parties when a secured party desires to accept collateral in full or partial satisfaction of the obligation.

[21]  *See, e.g.*, RCW 62A.9A-610/I.C. § 28-9-610 (repossession); RCW 62A.9A-620/I.C. § 28-9-620 (acceptance).

**MEMORANDUM DECISION AND ORDER - 22**

rather, it is an election of which path of remedy that the secured creditor will pursue. Washington Trust did neither.  The Bank did not elect Article 9 remedies, nor did the Bank elect judicial foreclosure remedies.  Instead, the Bank chose to proceed through a contracted work-out with both the debtor and the personal guarantor, by which the Bank agreed to take ownership of the broad collection of real and personal property associated with operating the Club, along with the contracts, agreements, and related intangible pieces of the business, in exchange for a full release of any obligation owed under the unpaid loans, either from the LLC or guaranteed by Chesrown.  The Bank did so for what was believed, apparently, to be appropriate business reasons, but the choice was not without risk.

Hence, the connection to Article 9 largely evaporated once the Bank decided to pursue a work-out agreement with the LLC and Chesrown that was intended to, as the Bank clearly acknowledges, avoid the delays associated with either judicial or non-judicial foreclosure and rather to obtain everything needed to continue to keep the Club operating, as quickly as possible.  That was the primary purpose of pursuing the DIL and the Bill of Sale, and the Bank gave up on the possibility of collecting anything further from the LLC or from Chesrown on his personal guaranty, by agreeing not to seek any further recovery from the LLC, or any recovery at all from Chesrown on his guaranty.  At that point in time, the Bank had chosen *not* to use statutory remedies to recover the remaining loan debt.

### 2.    Even if Article 9 is Not Directly Applicable, the Analysis is Much the Same

For the reasons described above, to the extent that the Bank would argue that UCC provisions dealing with successor liability dictate the Court's rulings on the issues raised by the pending cross-motions, the argument is misplaced on the facts of this case.  As a practical matter,

**MEMORANDUM DECISION AND ORDER - 23**

however, the germane arguments that would apply to successor liability generally in the UCC context still are at the center of the issues to be decided by the Court, and the bulk of the Bank's motion centers on the argument that "a corporation purchasing the assets of another corporation does not, by reason of the purchase of assets, become liable for the debts and liabilities of the selling corporation." *Uni-Com v. Argus Publishing, Inc.*, 737 P.2d 304, 311 (Wash. App. 1987).[22]  The Plaintiffs do not dispute the existence of this general rule, but argue that it does not apply here.

There are four exceptions to this general rule, which are: (1) the purchaser expressly or impliedly agrees to assume the liability; (2) the purchase is a de facto merger or consolidation; (3) the purchaser is a mere continuation of the seller; or (4) the asset transfer is for the fraudulent purpose of escaping liability.  *Id.*  Importantly, for purposes of a ruling upon this particular defense, the doctrine of successor liability (and the claim that one might bring based upon the doctrine) is equitable in nature.  *Id.* at 314.

Plaintiffs say the issue is quickly answered – they have brought a breach of contract claim

---

[22]  *Uni-Com* involves a successor corporation foreclosing upon a security interest in the predecessor corporation's assets.  737 P.2d 304, 307 (Wash. App. 1987).  In the foreclosure, the successor took the predecessor's intangibles, inventory and accounts receivable.  *Id.*  The court analyzed the case under successor liability and the four related exceptions.  It held that where a corporation was acting as a secured creditor to protect its interest and there was a manifestation to only pay some of the debts and not all, there was no implied assumption to pay on the promissory note at issue.  *Id.* at 311-12.  The court also held that the successor acted pursuant to a valid, perfected security interest under the Uniform Commercial Code and gave the predecessor adequate consideration.  *Id.* at 314.  "The doctrine of successor liability is equitable in nature and was not intended to impose the burden of paying unsecured debts upon a secured creditor."  *Id.*

The *Uni-Com* case is distinct from the facts here.  The *Uni-Com* holding relied, in part, upon the fact that the case involved a secured creditor foreclosing upon a valid security interest. It then analyzed the case under successor liability law.  While Washington Trust did have security interests in secured collateral, it chose to proceed in lieu of foreclosure.

**MEMORANDUM DECISION AND ORDER - 24**

and successor liability is an equitable remedy, which they are not raising.  Therefore, whatever the

law of successor liability may be, particularly as to any defense raised by the Defendants premised

upon the general rule, it is simply inapplicable.  The Court has taken a close look at this issue and

agrees with Plaintiffs – both because they have not asserted a successor liability claim, and because

it is unavailable to them in any event upon this record.  When there is an adequate remedy at law,

courts will not exercise equity jurisdiction.  *See Roon v. King County*, 166 p.2d 165, 168 (Wash.

1946) ("Equity does not intervene when there is a complete and adequate remedy at law"); *Hull v.*

*Giesler*, 331 P.3d 507, 518 (Idaho 2014).   Because the breach of contract claim represents an

adequate remedy at law for Plaintiffs, an equitable successor liability claim simply cannot be raised.

Defendants would ask the Court to recast Plaintiffs' claim for relief as an equitable claim

based upon successor liability.  There is no basis for doing so, other than it would give the Bank

some additional shade from the glare of the potential membership deposit liability.  But that is not a

reason based upon the legal principles at play, and the Plaintiffs are entitled to choose their

remedies.  Hence, there is no place for defenses to a successor liability claim in this case.  Such a

claim is simply not at issue.  However, for the reasons that are described to follow and as to which

the parties are in agreement, the question of whether the Bank is liable to refund the membership

deposits because it took an assignment from the LLC of the Membership Agreements and the

Membership Plan is answered under an analysis essentially the same as would be applied to decide a

successor liability claim in equity.[23]

---

[23]  Defendants state that whatever theory upon which these issues is analyzed (whether
breach of an assigned contract or successor liability) is not significant:  "It does not matter
whether the Court analyzes this case under assignee or successor liability principles.  Both
bodies of law invoke the same broad transferee liability principles, and both share the same
starting presumption: the transferee/assignee/successor does not assume liability absent proof of

**MEMORANDUM DECISION AND ORDER - 25**

C.      **The Black Rock Membership Agreement and Plan were Assigned to Washington Trust through the DIL Agreement and Related Documents, Including the Bill of Sale.**

The Court finds as a matter of law that the Membership Agreement and Plan were assigned to Washington Trust under the DIL Agreement and its related agreements.  In reaching that conclusion, the Court first looks to the language of the DIL Agreement and the accompanying Bill of Sale and Assignment.   The express assignment language of the Bill of Sale, which conveyed the Personal Property from the LLC to Washington Trust, included "all assignable . . . contracts, . . . licenses,. . . and agreements, of every kind and nature, relating to the Club . . . ."[24]  It is uncontested that the Membership Agreement was a contract in existence at the time of the DIL Agreement was executed.  Washington Trust knew it existed.  Among other things, Jack Heath, the president of the Bank, was a member of the Club, and therefore had his own Membership Agreement.  Further, both Dean Oberst (Commercial Special Assets Manager) and Dean Emmanuels (Washington Trust Vice President) knew of the Membership Agreement and the refundable nature of the membership deposits. (Emmanuels Dep. 132:2-17; 156:6-157:8; 164:3-165:6; Oberst Dep. 27:8-15; 31:13-32:12; 85:11-25.) Significantly, the Membership Agreement could have been excluded from the Bill of Sale (as was the liquor license), but it was not.

Next, the Court considers the motives and the goal of the Bank.  Prior to the execution of the DIL Agreement, both Heath and Oberst testified that the Bank had many alternatives available to it,

_____

assumption."  Defs.' Response at 6 (Dkt. 119).  The factors relevant to whether an assignee has assumed liabilities under an assigned contract are the same factors that are addressed under whether there was an express or implied assumption under successor liability.

[24]  Significantly, the Bank expressly excluded certain assets from this list, such as "any permits and licenses relating to Alcoholic Liquor as defined in I.C. 23-105."  Accordingly to Oberst, Washington Trust and its subsidiary West Sprague could not hold a liquor license or sell alcohol.  Oberst Dep. 105:10-14.

**MEMORANDUM DECISION AND ORDER - 26**

including foreclosure,[25] but that the fastest and most favorable resolution in the collective mind of the Bank was to obtain a deed in lieu of foreclosure.  (*See* Oberst Decl. ¶ 7; Heath Dep. 141:15-24, 178:16-20.)  As described earlier, the Bank made intentional decisions intended to insure that it would own, so that it could in turn sell, a fully functioning championship golf club, with a pristine course, intact amenities and a stable base of members – not a closed golf course "gone to seed."

In the same vein, Section 2.2 of the DIL Agreement made clear that the LLC " *shall have no further interest or claim* in or to the Personal Property conveyed by the Bill of Sale and Assignment, *or to any proceeds or profits of any kind* whatsoever that may be derived from the Personal Property."  (Emphasis supplied.)  This provision eliminated the LLC's interest in any of the Personal Property conveyed, which included "all contracts . . . and agreements."  Hence, as a matter of law, whatever had been in the LLC's basket of property and contract assets before the DIL Agreement and the Bill of Sale were executed was handed over in its entirety to the Bank, less only the property that was specifically excluded.  That basket contained, among many other things, the Membership Agreement.

**D.    Did the Bank Assume the Membership Deposit Refund Obligation as the Assignee of the Membership Agreement and Related Contracts?**

**1.    As a Matter of Law, there Was No Express Assumption of the Membership Deposit Refund Obligation**

Washington law is consistent with black letter contract law in recognizing that once a contract is assigned, the "assignee stands in the shoes of the assignor."  *Paullus v. Fowler*, 367 P.2d

---

[25]  Bank officials repeatedly refer to "preserving the asset" in their depositions.  But once the DIL was executed, the Property was no longer collateral.  The Bank now owned that Property.

**MEMORANDUM DECISION AND ORDER - 27**

130, 135 (Wash. 1961). For executory contracts,[26] such as the Membership Agreement,[27] the general rule includes the proviso that the assignee is only liable on the underlying obligations if there is an express assumption of those obligations. *Hardinger v. Fullerton*, 5 P.2d 987, 989 (Wash. 1931). Such an express assumption can take place at the outset through a written promise by the assignee to assume a specific obligation. Or it can occur over time, by implication, where the assignee's conduct manifests an intent on the part of the assignee to be bound to such liabilities. *Northern Pac. Ry. Co. v. Sunnywide Val. Irrigation Dist.*, 527 P.2d 693, 695 (Wash. App. 1974) (reversed on other grounds).

Necessarily, proof of an implied assumption of contractual liabilities is a heavily fact-intensive exercise in which all circumstances must be considered, such as the subject matter of the contract, the assignee's acts and words, whether there was acquiescence in the terms of the contract that might implicate contractual liabilities, whether there was performance of such obligations, and whether there was acceptance of its benefits. *Id.* On this record, there was an express assignment of the Membership Agreement to the Bank as described above. However, to place responsibility on the Bank to refund the membership deposits, as called for in the Membership Agreement, requires proof of an assumption of that liability by Washington Trust. The Count concludes as a matter of law there was no such *express* assumption in writing of such a liability. As set forth in the facts, the Bank generally disclaimed any responsibility for the debts or other liabilities of the LLC. There was

---

[26] An executory contract is a contract that has not been fully completed or performed, or in which the obligation relates to some future event. *Lewis v. Boehm*, 947 P.2d 1265, 1268 (Wash. App. 1997).

[27] The Membership Agreement was assigned through the DIL, Bill of Sale and related documents as discussed *supra*.

**MEMORANDUM DECISION AND ORDER - 28**

no express assumption of the membership deposit refund liability.  Further, even if not directly pinpointed to the membership deposits, there are multiple instances contained in the relevant documents which evidence general and specific disclaimers of liability on the part of the Bank for the liabilities of the LLC.

Perhaps an argument could be made from this record that simply because the Membership Agreement and Membership Plan were part of the bundle of contract rights assigned to the Bank, there must also be a genuine issue of material fact as to whether the assignment constituted an express assumption of the membership refund liability.[28]  The Court has given careful consideration to that possibility, based upon its independent review of the record.  However, the Court is more than satisfied that on the facts of this record no reasonable juror could conclude anything but that the Bank sought (at least in the written documents) to expressly disclaim and avoid liability for debts, or potential liabilities, such as refunding the membership deposits, and that such evidence establishes as a matter of law that there was no express assumption of the membership refund liability.

2.     **A Genuine Issue of Material Fact Exists as to Whether the Membership Deposit Refund Liability was Impliedly Assumed by Washington Trust.**

As previously described, an implied assumption requires consideration of all the circumstances, such as the subject matter of the contract, the assignee's acts and words, and whether he acquiesced in the terms of the contract, performed its obligations, or accepted its benefits.  For example, in *Northern Pacific Railway Co. v. Sunnyside Valley Irrigation District*, 527 P.2d 693 (Wash. App. 1974), the defendant irrigation district had agreed to take over, maintain, and operate a

---

[28]  This argument exists regardless of whether such a liability was choate at the time of the assignment of the agreement and thereby somehow clearly excluded, as the Bank would argue, or whether it was only inchoate at that time, as the Plaintiffs contend.

**MEMORANDUM DECISION AND ORDER - 29**

drainage system from the county.[29]  Part of the drainage system included a culvert on property

owned by the railroad company, which had given the county a  permit to construct and utilize the

culvert.

A permit contained an indemnity provision, which later came into play when a canal break

overwhelmed the capacity of the culvert, causing damage to the railroad's property.  The irrigation

district contended that it had no responsibility under the indemnity provision granted by the county

to the railroad, but the court disagreed: "Here, the [irrigation district's] beneficial use of the culvert

is so entwined with the indemnity provision that as to [the railroad company], [the irrigation district]

cannot be heard to deny that it assumed the obligation."  *Id*. at 695.  The court reasoned that the duty

to operate and maintain the drainage system was inseparable from the duty to hold the railroad

harmless from any loss or damage occasioned by the use of that system.  *Id*.

A similar analysis, with facts analogous to this case, was employed in *Dahlhjelm Garages v.*

*Mercantile Ins. Co. of Am.*, 270 P. 434 (Wash. 1928).  In *Dahlhjelm Garages*, the plaintiff

purchased a vehicle under a conditional sales contract.  The contract covered the purchase price, and

the installment payments for the same, *and* an additional charge "to cover insurance and carrying

charges" for the seller to maintain insurance on the vehicle for the life of the sales contract.  270 P.

at 435-36.  The seller later assigned the contract to the defendant, Pacific Finance Corporation, after

---

[29]  The contract between the irrigation district and the county specifically stated: "The
Sunnyside Irrigation District shall perform all necessary Operation and maintenance work during
the period when the betterment and rehabilitation of the drains is under way, and upon
completion of such betterment and rehabilitation work, the Sunnyside Irrigation District shall
Operate and maintain all drains in such condition as to provide at all times the designed capacity
of such drain for seepage, waste and run-off waters from lands within Drainage District No. 9,
including waters that shall flow thereon from lands lying at a higher elevation.  All such
operation and maintenance shall be performed without cost to the County, Drainage District No.
9, or the United States."  *Id*. at 694, n.1.

**MEMORANDUM DECISION AND ORDER - 30**

which the vehicle was involved in an accident not covered by an insurance policy Pacific Finance

had acquired on its own, which was not the original policy. *Id.* The question was whether Pacific

Finance assumed the obligation to keep the automobile adequately insured. The court concluded it

did. At the time Pacific Finance acquired the sales contract, a number of installment payments

including the additional insurance charge remained due into the future. Pacific Finance collected

these installment payments from the Plaintiff buyer and applied the payments to its own use. The

payments were not voluntary; rather, they were paid pursuant to the terms of the contract. The court

reasoned that Pacific Finance, in exacting and accepting these payments, assumed the corresponding

duty to perform the conditions of the contract, namely maintaining adequate insurance. Because it

failed to do so, the court found it was liable for the damages Dahlhjelm suffered. *Id.* at 436.

The Court finds strong evidence in this record to support Plaintiffs' claim that the

membership deposit refund obligation was assumed by the Bank, and such evidence – both direct

and inferential – certainly withstands Defendants' motion for summary judgment on that issue. The

Court considered carefully whether such evidence was sufficient to rule as a matter of law that the

Bank had impliedly assumed such liability, but ultimately concluded that there is potentially

conflicting evidence in the record upon which reasonable minds could differ as to whether liability

was assumed. The Court will discuss some of both sides of that evidence below. On balance, the

Court concludes it cannot grant summary judgment to either party and the issue will need to be

resolved by the trier of fact.

### a.    "Continued Operation" of the Club

In the DIL itself, Washington Trust agreed, and Marshall Chesrown insisted, that the Bank

would "reasonably endeavor to continued stabilized operation of the Club" through at least the 2010

**MEMORANDUM DECISION AND ORDER - 31**

season, "at a level of services and amenities that is consistent with the prior ownership of the Club, provided that membership is maintained with a sufficient number of dues paying members to sustain operation . . ." DIL Agreement, § 6.3. This "continued operation" provision was echoed in other parts of the DIL Agreement, including Recital G and Section 9.11.[30]

        **b.**    **The Bank Took Ownership of the Club and its Facilities and the Club Remained Open During its Ownership**

The Bank took title and ownership of all the LLC assets that comprised the real property and personal property and operated the Club for the entire remainder of the 2010 golfing season - a period of approximately 80 days spanning nearly three months. That ownership did not end until the Bank's sale of the Club assets to The Golf Club at Black Rock, LLC on November 1, 2010. During that time period, the Club remained open at all times. Andrew Gorton (the Club general manager) and Bank President Jack Heath (a Club member) testified there was no change in how the Club operated over that time, from how it had been operated pre-DIL. Certainly one inference from such evidence is that the Bank figuratively put on golf shoes instead of wingtips, and ran the Club. From outward appearances, nothing had changed. Members had the access to the same services and amenities. They paid the same dues.[31] To continue operation, vendors and other creditors of the Club had to be paid and the Bank did pay such liabilities - both for those incurred pre-DIL and those incurred post-DIL. The Bank did so to maintain the Club as a going-concern, because the Bank believed that an operating private golf club would be more attractive to potential purchasers.

---

[30] Recital G stated a deed in lieu of foreclosure was "necessary to allow for continued operation of the Club." Section 9.11 stated that Washington Trust should "consider the best interests of Club membership" prior to any assignment or transfer of the DIL Agreement, or the Property.

[31] The obligation of members to pay dues came from the Membership Plan.

**MEMORANDUM DECISION AND ORDER - 32**

Washington Trust even took the declarant rights to the homeowners' association, which were not previously held by the LLC, and appointed its employees and consultant Shiflett to the association's board of directors.

The Bank argues, however, that it intended to hire a third-party golf course management company to manage the Club, but after that effort failed the Club's general manager, Andrew Gorton, and other LLC employees and Club staff continued to work at the Club.  The Bank contends that it was those persons and the LLC, not the Bank, managing the Club during that time period.  Both Heath and Oberst testify to this effect.  (*See* Oberst Dep. 104:24-105:3; Heath Dep. 42:6-13, 96:7-10, 189:15-17.)  Gorton did continue with the same duties and responsibilities he had under the LLC's ownership.  However, Gorton testified that because the LLC no longer owned the Club, he believed he needed a written management or agency agreement with Washington Trust, but one was never reached.  (*See* Gorton Dep. 134:9-135:23.[32,33])

### c.    The Club's "Monies" and the Bank's Infusion of Capital into the LLC's Checking Account

Most of the Bank's argument in support of who was actually "running" the Club focuses upon who was collecting the money and paying the bills of the Club.  After the DIL, the Club continued to operate in the red, as it always had.  In order to keep the Club open, and operating as a going concern, Washington Trust infused its own funds into the LLC's bank account to pay bills left unpaid at the time ownership transferred and to keep the Club operating after the change in

---

[32]  Gorton also testified, however, that post-DIL he "reported to Marshall" and "mostly called Chad [Rountree]."  Gorton Dep. 66:2-3, 11.

[33]  Also added into the mix is Chesrown's deposition testimony following the DIL, the Club employees were "not his," and his contradictory declaration that they *were*.  *See, supra*, note 16.

**MEMORANDUM DECISION AND ORDER - 33**

ownership.  These transfers totaled in the several hundred thousand dollars.  They were not loans.
(*See* Oberst Dep. 128:7-9).

Washington Trust hired an outside consultant, Julie Shiflett, to offer her advice and
recommendations on what were essential expenses and what expenses it should fund.  The Bank
made the ultimate decision about whether to put additional monies into operating the Club when the
revenues of the Club were not sufficient to meet expenses - no one else.

Both pre-DIL expenses, including pre-DIL invoices and pre-DIL sales taxes, and post-
DIL expenses were paid.  Washington Trust places emphasis on the fact that these payments came
from the LLC's bank account and were signed by Rountree, the LLC's financial officer.  The Bank
points out that none of the Bank's employees was a signatory on the checking account, so it is true
that no one at the Bank had the ability to sign any of the checks.  However, the language contained
at § 2.1(c) of the DIL gave the Bank "full power" to deal with the "Personal Property"[34] or proceeds
thereof in its own name or that of the Club which would include the LLC's checking account at
Washington Trust.  Along that same vein, § 2.2 of the DIL stated that the LLC had "no interest or
claim" in any "proceeds of the Personal Property."

Members continued to pay dues that were deposited into the Club's checking account - these
amounted to a significant portion of a total revenue stream of nearly $2 million collected from
August 11, 2010 until the Club was sold.

### d.    DIL Provisions

Washington Trust points to provisions in the DIL Agreement to support its argument that not

---

[34]  That "Personal Property" included accounts and "all other intangible property used in
connection with the use, operation . . . of the Club."

**MEMORANDUM DECISION AND ORDER - 34**

only was the refund liability *not* assumed, it was expressly disclaimed. The most significant of these contentions is based upon Section 7.4 of the DIL, which provides:

> The [LLC] acknowledges and agrees the acceptance by [Washington Trust] of title to and [the LLC]'s interest in the Property pursuant to the terms of this Agreement shall not create any obligations on the part of [Washington Trust] to third parties that have claims of any kind whatsoever against [the LLC] with respect to the Property and that [Washington Trust] does not assume or agree to discharge any liabilities pertaining to the Property that occurred *prior to the date of Closing*, except as specifically assumed by [Washington Trust].

(Emphasis added).

The LLC also agrees in this section to indemnify and hold Washington Trust free and harmless from any liabilities resulting from events prior to closing. Washington Trust contends that the refund liability was an existing obligation at the time the DIL was executed (because the membership deposits had been listed as liabilities on the LLC's financial records) and therefore, this section expressly disclaims liabilities to third parties that occurred *prior to* closing.

Although the Court agrees that there was not an express assumption of the refund obligation, this provision of the DIL does not protect the Bank from Plaintiffs' claim that there has been an implied assumption.  Section 7.4 is an acknowledgment and agreement on behalf of the *LLC* that Washington Trust is not liable or responsible for claims that occurred prior to Closing and that the LLC will indemnify Washington Trust for any such claims or liabilities.  Implicit in the very fact of a indemnification is the predicate fact of an underlying claim or liability that Washington Trust is required to pay.  Hence, the Bank might raise a claim against the LLC if held liable to the Plaintiffs for the membership deposit refunds, but that right of indemnification is not a separate defense, as a matter of law, against the Plaintiff's claim seeking to recover such amounts from the Bank.

Additionally, central to the Bank's argument regarding Section 7.4 is its contention that the membership deposits previously had been treated as a "liability" on the LLC's annual balance

**MEMORANDUM DECISION AND ORDER - 35**

sheets.  However, the characterization of the membership deposit refunds on the LLC balance sheets is not dispositive as to whether they are considered a "liability" for purposes of Section 7.4 to preclude Plaintiffs' claims in this lawsuit.   The unilateral characterization given to an accounting entry by the LLC does not govern its character for every other purpose.  As discussed further below, the Court finds that the Plaintiffs' right to a refund did not accrue until the Club facilities were closed and their memberships terminated effective October 31, 2010.  This occurred *after* the DIL closed on August 11, 2010.[35]  Hence, Plaintiffs would say their claims were not pre-closing liabilities.

Washington Trust also cites provisions from the DIL in which third party beneficiary rights are disclaimed (Sections 7.4,[36] 9.12[37]) and language providing that there is no partnership between Washington Trust and the LLC that would make the Bank responsible for any liabilities or obligations of the LLC (Section 9.10[38]).  Washington Trust argues from such provisions that

_____

[35]  *See In re QR Properties, LLC*, 485 B.R. 20 (Bankr. D. Mass. 2013), involving a similar situation involving claims against a successor corporation for refunds of membership deposits to a country club.  The court, having found the successor corporation was a "mere continuation" of the predecessor corporation and thus succeeded to the liabilities of the predecessor, ultimately held the members were not entitled to a refund.  The country club bylaws provided for a refund only if the country club and its facilities were permanently discontinued.  Because the facilities and operations were never permanently discontinued, the members were not entitled to a refund.  Put simply, the refund obligation was not triggered.  *Id.* at 28.  The first part of this holding is directly relevant to the facts of this case.  The second part of the holding involves facts not present in this case.

[36]  The last sentence of Section 7.4: "No person not a party to this Agreement shall have any 'third-party beneficiary' or other right hereunder."

[37]  "The provisions of this Agreement are solely for the benefit of [Washington Trust] and [the LLC], and do not inure to the benefit of, or confer rights upon, any third party."

[38]  "The relationship between [Washington Trust] and [the LLC] is that of debtor and creditor.  Nothing contained in this Agreement will be deemed to create a partnership or joint venture between [Washington Trust] and [the LLC], or between [Washington Trust] and any

**MEMORANDUM DECISION AND ORDER - 36**

Plaintiffs cannot enforce the refund obligation under the Membership Agreement without first establishing that they are third party beneficiaries to the DIL.

Plaintiffs, contend, however, that they are not bringing their claims for breach of contract on the DIL Agreement as third party beneficiaries (rather, they are suing as parties to contracts assigned to the Bank), nor are they arguing there was a partnership or other joint venture relationship between the LLC and the Bank.[39]

### E.     The Refund Obligation was Triggered

Washington Trust also argues that there is no evidence that it was the one to close the Club facilities or that it required the LLC to terminate the membership agreements. It is undisputed that it was a demand from the New Buyer that the memberships be terminated prior to the closing of the sale.  It was Mr. Chesrown purportedly, on behalf of the LLC, who wrote the letter to members on October 29, 2010 notifying them that their memberships were terminated effective October 31, 2010.  However, the Bank owned the Club and everything about the Club, and the agreements with the Members had been assigned to the Bank.  Only the Bank could close the sale with the new

---

other party, or to cause [Washington Trust] to be liable or responsible in any way for the actions, liabilities, debts, or obligations of [the LLC]."

[39]  Plaintiffs also contend that, regardless of what these provisions say, in contract construction "specific provisions control over general provisions."  *See, e.g., Foote v. Viking Ins. Co. of Wisconsin*, 790 P.2d 659, 661 (Wash. App. 1990).  Plaintiffs argue that other, more specific, provisions in the DIL, such as its promise to keep members' best interests in mind and to continue operation of the Club, clearly show that the members were indeed intended third party beneficiaries, and that any general provision (such as § 9.12) in the DIL inconsistent with that is unenforceable.  (*See* Pls.' Resp at 18.)  These issues are mooted by the Court's ruling that the Plaintiffs are bringing a first-party breach of contract claim on the Membership Agreement and Membership Plan, which were assigned to the Bank.  However, the fact of this provision also may be evidence arguably relevant to the jury's decision upon whether the Bank impliedly assumed the membership deposit refund liability.

**MEMORANDUM DECISION AND ORDER - 37**

buyer.  The LLC had no dog in that fight.  The memberships were terminated as announced in the

Chesrown letter, but it was the memberships in a Club owned by the Bank, not the LLC, that were

terminated.  (Other than the Bank officers who were members of the Club, or involved in the

purchase of the Club by The Golf Club at Black Rock, LLC, the members had no obvious reason to

know of the details of the Bank's work-out agreement with Chesrown and the LLC.)  In that respect,

it makes no difference whether the letter had been written by Marshall Chesrown or Jack Heath.[40]

As of October 31, 2010, the members of the Club were no longer able to access the Club facilities

and their memberships were terminated.[41]  Once the memberships were terminated and the facilities

closed to the members, the refund obligation in the Membership Agreement/Plan was triggered.

When those refunds were not made within 30 days, the agreement was breached as a matter of law.

## CONCLUSION

By virtue of the  DIL Agreement and Bill of Sale the Membership Agreement and

Membership Plan were assigned to Washington Trust.  Washington Trust took over the operation of

---

[40]  The Court has considered the Bank's reliance upon testimony from John Magnuson,
the attorney for the new buyer, to the effect that the Bank consistently said it did not have the
authority to terminate the memberships.  His testimony in that regard is no different, nor is its
import any more persuasive, than the repeated statements by the Bank that the Bank was not
operating the Club. Regardless, even if the Bank says it did not have the authority to terminate
the memberships, the Bank had taken an assignment of the Membership Agreement and the
refund obligation was triggered when the facilities were closed to members effective October 31,
2010.  The only remaining question is whether the Bank impliedly assumed liability for the
membership deposit refund obligations triggered by the closing of the Club.

[41]  Plaintiffs take issue with Defendants' attempt to characterize the Asset Purchase
Agreement as occurring on October 28, 2010.  By doing this, Plaintiffs argue that Defendants are
attempting to make it appear the "termination" (and triggering event) occurred *after* the Bank
sold the assets to the New Buyer.  Thus, the refund obligation was not triggered when the Bank
owned the Property.  The Asset Purchase Agreement was signed on October 28, 2010.  The
transaction closed on November 1, 2010.  *See* Magnuson Decl. ¶¶ 3-4, Exs. A, B.

**MEMORANDUM DECISION AND ORDER - 38**

the Club beginning on August 11, 2010 and continued until October 31, 2010.  It kept the Club open

to the existing members with the same services and amenities.  Member dues were collected.

Memberships were suspended if dues were not paid.   Washington Trust put its own funds into the

Club to keep it afloat.  Whether these actions, and the other surrounding facts, mean the Bank

impliedly assumed the refund obligation is a question for a jury.   As of October 31, 2010, the

Club's facilities were closed to the existing members and their memberships were terminated.  This

initiated the refund obligation.  When those refunds were not made to Plaintiffs within 30 days, the

agreement was breached.  *See Shawyer v. Huckleberry Estates, LLC*, 93 P.3d 685, 692 (Idaho 2004).

The Court holds: (1) as a matter of law that the Bank took an assignment of the Membership

Agreement and related Membership Plan which contain the details of when the members have a

right to a refund of their membership deposits; (2) as a matter of law that the right to a refund of the

membership deposits was triggered when the memberships were terminated and the golf course

facilities closed to the members; (3) as a matter of law that the Bank did not make an express

assumption of the liability for the membership deposits, having made express disclaimers of any

such type of liability in the work-out agreement; and (4) that there are genuine issues of material fact

which preclude summary judgment for either side, and which will require resolution at trial, on the

remaining ultimate issue of whether the Bank impliedly assumed liability for the membership

deposit refunds because of its actions and conduct in the manner in which it took ownership of the

Club and its facilities, and in the manner in which the Club continued to operate it until it was

ultimately sold.

**MEMORANDUM DECISION AND ORDER - 39**

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED:**

(1)     Plaintiffs' Motion for Summary Judgment (Dkt. 99) is GRANTED IN PART and

        DENIED IN PART;

(2)     Defendants' Motion for Summary Judgment (Dkt. 89) is GRANTED IN PART and

        DENIED IN PART.

DATED:  **September 3, 2015**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 40**