# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT CAYNE, RONNIE RIVERA, SEAN RIVERA, KEN McELROY, and the same on behalf of themselves and on behalf of all others similarly situated, | Case No.: 2:12-cv-000584-REB |
|     Plaintiffs, | **MEMORANDUM DECISION AND ORDER ON PLAINTIFFS' RULE 50 AND RULE 59 MOTIONS** |
|     vs. | |
| WASHINGTON TRUST BANK, a Washington corporation; and WEST SPRAGUE AVENUE HOLDINGS, LLC, a Washington limited liability company, | |
|     Defendants. | |

This decision and order addresses the issues raised in Plaintiffs' Renewed Motion for Judgment as a Matter of Law (Fed. R. Civ. P. 50(b)), or in the alternative, Motion for New Trial (Fed. R. Civ. P. 59) (Dkt. 415). The first motion renews Plaintiffs' Rule 50(a) motion for judgment as a matter of law, which was made at the close of evidence. The second motion seeks alternative relief, in the form of a new trial.

## INTRODUCTION

Following several years of litigation, this case culminated in a multi-week jury trial. On March 21, 2016, the jury returned a unanimous verdict in favor of Defendants Washington Trust

**DECISION AND ORDER ON RULE 50 AND 59 MOTIONS - 1**

Bank ("the Bank") and West Sprague Avenue Holdings, LLC ("West Sprague"). Subsequently, Plaintiffs filed the referenced motions, supported by a brief in support of their combined Rule 50(b) renewed motion for judgment as a matter of law and Rule 59 motion for new trial. *See* Dkt. 416. Defendants filed a response, which was followed by a reply brief from Plaintiffs. *See* Dkts. 448, 452. The record underlying the motions contains over 1600 pages of attachments to the briefing (including trial and other exhibits) and approximately 2300 pages of trial transcript. *See* Dkts. 418-446.

First, the Court will address the renewed Rule 50 motion for judgment as a matter of law, and then the motion for a new trial. The particular issues, evidence details, witnesses, and related particulars are already well-known to the parties and largely have been discussed at length in prior orders of the Court. Therefore, the Court will not attempt an exhaustive background here.

## **JUDGMENT AS A MATTER OF LAW / Fed. R. Civ. P. 50(a) and (b)**

### A.    **Standard**

Fed. R. Civ. P. 50(a)(1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Relevant here, Rule 50(b) permits renewed motions for judgment as a matter of law made under Rule 50(a) and provides that the court may: "(1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." Fed. R. Civ. P. 50(b). A Rule 50(b) motion for judgment as a matter of law is not treated as a

separate motion; instead, it is a renewed 50(a) motion. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). A Rule 50(a) motion is made before the case is submitted to the jury. If the court defers or denies the motion, and if the jury then returns a verdict against the movant, the movant may renew the motion under Rule 50(b).[1] *Id.* However, because the 50(b) motion is a renewed motion, the grounds for the motion are limited to the same as those asserted in the prior Rule 50(a) motion. "A party cannot properly raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its preverdict Rule 50(a) motion." *Id.* (internal quotation marks omitted). Accordingly, this decision addresses and resolves both the Rule 50(a) and Rule 50(b) motions as one Rule 50 motion.

In considering a Rule 50 motion, the court must view the evidence in the light most favorable to the prevailing party and must draw all reasonable inferences in favor of the non-moving party. *First Nat. Mortgage Co. v. Federal Realty Inv. Trust*, 631 F.3d 1058, 1067 (9th Cir. 2011); *Lakeside-Scott v. Multonomah County*, 556 F.3d 797, 802 (9th Cir. 2009); *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). Further, the court shall "give significant deference to the jury's verdict and to the nonmoving part[y] . . . ." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013).

Under such constraints, a jury verdict can be set aside and judgment granted as a matter of law in favor of the moving party "only if, under governing law, there can be but one reasonable conclusion as to the verdict and only if there is no legally sufficient basis for a reasonable jury to find for [the non-moving] party on that issue." *Jules Jordan Video, Inc. v.*

---

[1] Plaintiffs made a Rule 50(a) motion at the close of evidence as to which the Court deferred ruling at the time. *See* Dkt. 420-2, pp. 223-227.

*144942 Canada Inc.*, 617 F.3d 1146, 1155 (9th Cir. 2010) (internal quotation and citations omitted); *see also A.D.*, 712 F.3d at 453 ("judgment is proper if the evidence construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion [...] contrary to the jury's verdict." (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002))); *First Nat. Mortgage*, 631 F.3d at 1067-68 (verdict upheld if supported by substantial evidence, "even if it is also possible to draw a contrary conclusion[,]" and court "must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury[ ]" (internal citation and quotation omitted)).  Further, a jury's factual findings must be upheld if there is substantial evidence in support of the jury's verdict.  *Microsoft Corp. v. Motorola, Inc.*, 795 F.3d 1024, 1045 (9th Cir. 2015).

Plaintiffs argue that the proof at trial permits only one reasonable conclusion – in their favor.  Therefore, Plaintiffs contend the Court should have granted judgment in their favor at the close of evidence, and that the jury verdict in favor of the Defendants is untenable.  More specifically, Plaintiffs seek judgment as a matter of law because: (1) in the period after the Deed in Lieu Agreement, the Club's staff became the Bank's employees or agents and the jury should have been instructed as such as a matter of law; (2) West Sprague was the alter ego of the Bank; and (3) the Court erroneously instructed the jury on the law of assumption of a contract liability by implication.   The Court will consider such arguments in turn.

**B.      The Court Properly Did Not Instruct the Jury that the Club Staff Were Employees/Agents of the Bank**

Plaintiffs contend that after execution of the Deed in Lieu agreement ("DIL"), the Club's staff became the employees or agents of Washington Trust Bank ("the Bank").  Plaintiffs argue that every asset was stripped out of the Club at Black Rock, LLC and became the Bank's assets,

including the Club's checking account.[2]  Plaintiffs contend the Club's staff were paid by checks drawn on the Club's checking account and the Bank had the right to control the employees' work, and therefore, it is indisputable that the staff members became the Bank's employees or agents.  Pls.' Mem., Dkt. 416, p. 20.

The Bank, on other hand, says that Plaintiffs failed to prove that the Bank or West Sprague exercised any control over the Club's management team or employees during the relevant post-DIL time frame and therefore, there was not a sufficient basis for an instruction as a matter of law that the Club's staff were the employees and/or agents of the Bank or West Sprague.  Defs.' Mem., Dkt. 448, p. 22.

Idaho law describes an agency relationship as one that arises from "the manifestation of consent by one to another that the other shall act on his behalf and subject to his control and consent by the other so to act."  *Thornton v. Budge*, 257 P.2d 238, 240 (Idaho 1953).  The party alleging the existence of an agency relationship carries the burden of proof and where the existence of an agency relationship is disputed, it is a question for the trier of fact to resolve from the evidence.  *Gissel v. State of Idaho*, 727 P.2d 1153, 1157 (Idaho 1986).[3]

---

[2]  As was done in prior rulings, the Court uses the term "LLC" to refer to the "Club at Black Rock, LLC," the legal entity that was owned by Marshall Chesrown.  The Court uses the term "the Club" to refer to the golf course, improvements, equipment, and related facilities that were the primary assets of the LLC.

[3]  The status of the Club staff members in relation to the Bank or West Sprague was the subject of two instructions.  Jury Instruction No. 30 drew upon Idaho Civil Jury Instructions 6.40.1 ("Agency Defined") and 6.40.5 ("Agency Defined") (of which Plaintiffs proposed a modified version in their proposed jury instructions).  *See* Dkt. 411 at 27.  Jury Instruction No. 31 ("Burden of Proof - Agency") was proposed by Defendants and states that the burden of proving agency rests with the party asserting it.

The trial evidence showed that after the DIL, the Club's existing general manager (Andy Gorton) continued to make hiring and work schedule decisions, the employees continued to have state and federal income taxes withheld, and the employees received all the same benefits as they had before the execution of the DIL. As part of the DIL, assets were transferred to the Bank (and later to West Sprague), including accounts such as the bank accounts.[4] Plaintiffs contend that the LLC was a "barren corporate shell" with nothing that it could operate, including the Club, and that it was the Bank's money paying the employees and such that they were inescapably employees/agents of the Bank.

Such evidence is significant, and supports Plaintiffs' theory. However, there was other evidence that did not. Mr. Gorton testified that the Bank and West Sprague did not exercise *any* control over the Club's employees. Among other things, Gorton said that even after the DIL, if the Bank or West Sprague said one thing to him and Marshall Chesrown told him to do something else, he would do what Mr. Chesrown instructed. *See, e.g.*, Gorton Testimony, Dkt. 418-3, 69:6-11. There was repeated, and consistent, testimony from the staff members of the Club and from Bank employees that after the execution of the DIL, the Club was to be and would be operated exactly as it had been operated previously (and therefore, by inference, in the same hands that had been running the show prior to the DIL) for various reasons, including the fact that the Bank "wasn't in the business of running a golf course" and didn't know how to run a golf course.[5]

---

[4] There was special treatment of the transfer of the liquor license owned by the LLC and used at the Club because of the fact that the Bank could not own a liquor license. However, that discrete aspect of the larger DIL transaction does not change the analysis under Rule 50.

[5] Bank officials testified that the Bank did not want to own or run a golf course. *See, e.g.*, Heath Testimony, Dkt. 419-3, 108:18, 150:8-9; Oberst Testimony, Dkt. 420, 151:24-152:4.

**DECISION AND ORDER ON RULE 50 AND 59 MOTIONS - 6**

The sum of all of the evidence could be argued to support either side of the dispute. Further, there was conflicting evidence as to what role, if any, Chesrown may have played in the operation of the Club after the DIL, *i.e.*, was he involved in some manner – whether directly or as a figurehead – or was he not?  Further, even if he was involved, what was his motivation for any continuing involvement with the Club?  Was he involved to keep the Club running as is, with an intact membership base, so as to help the Bank peddle the Club to some other entity as a going-concern (and make a windfall as a result, as Plaintiffs theorized)? Was he involved because of his purported loyalty to the Club members, wanting to keep the Club operating for their benefit?  Or was he entirely self-serving, acting only to sweeten what Plaintiffs contended was an already sweet deal when it came to removing him from personal liability for any of the enormous unpaid liability owed to the Bank prior to the DIL?

There was evidence put forward on this issue from which Plaintiffs could, and did, strongly argue that such agency existed.  However, that conclusion was not the only reasonable conclusion that could be drawn.  Against that standard, Plaintiffs' contention that the jury should have been instructed as a matter of law that the Club's staff were employees or agents of the Bank and/or West Sprague cannot prevail.  The Court concluded that the evidence presented could result in more than one reasonable conclusion and instructed the jury in that manner, leaving the issue to be resolved by the jury.  The Court is not persuaded of a different result on the renewed motion and denies Plaintiffs' Rule 50 motion on this issue.

**C.**     **The Court Properly Did Not Instruct that West Sprague was the Alter Ego of the Bank**

Plaintiffs contend that, as a matter of law, West Sprague was the alter ego of Washington Trust Bank.  Plaintiffs emphasize several pieces of evidence – the Bank owned all of West

Sprague; that there were officers of West Sprague who were common to the officers of the Bank; that West Sprague's only assets were those conveyed to it by the Bank; that the Bank owned the building where West Sprague's business was conducted; that all decision-making for West Sprague was made by the Bank's officers; that the Bank paid all of the Club's operating expenses and funded the Club's checking account, and that the Bank paid expenses and salaries (if any) related to West Sprague. *See* Pls.' Mem., Dkt. 416, pp. 22-23.

Defendants disagree that such evidence establishes alter ego status as a matter of law, contending that such facts simply describe West Sprague's "mere subsidiary status." Such "mere control and even total ownership," according to Defendants, do not warrant the disregard of a separate corporate entity, must less a determination as a matter of law that West Sprague was the alter ego of the Bank. *See* Defs.' Mem., Dkt. 448, p. 23.

Under Idaho law, two elements must combine to justify disregarding the legal status of distinct business entity existence. First, there must be such a "unity of interest" between the two entities that there are not separate personalities between the two. Second, it must appear from the facts that the observance of the fiction or separate existence of two separate entities would, under the circumstances, sanction a fraud or promote injustice. *Bailey v. Price Manufacturing Co., LLC*, 2015 WL 12681370, *6 (D. Idaho Jan. 23, 2015); *Hayhurst v. Boyd*, 300 P. 895, 898-99 (Idaho 1931); *see also Tolman v. American Red Cross*, 874 F. Supp. 2d 928, 936 (D. Idaho 2012) (discussing that proof of alter ego status is required to pierce corporate veil of even parent and subsidiary companies); *Hutchison v. Anderson*, 950 P.2d 1275, 1279 (Idaho Ct. App. 1997) (party asserting alter ego must put forward "sufficient evidence such that there is no distinction" between the two entities).

Various factors guide the assessment of whether an alter ego relationship exists, including the level of control that the shareholder exercises over the corporation, whether separate business formalities are observed, whether the entities are operated separately and keep separate books, and the decision-making process of the entities. *E.g., Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368, 376 (Idaho 2014). In *Wandering Trails*, a land development limited liability company and its managing member brought breach of contract and related claims against a paving company known as Piper Ranch, LLC ("Piper Ranch"), and its only members, husband and wife Tim and Julie Schelhorn ("the Schelhorns").[6] The claims arose in part from an assignment agreement between the plaintiff developer and Piper Ranch. *Id.* at 371.[7] The plaintiff sought to impose liability against the Schelhorns on the theory that Piper Ranch was their alter ego, arguing that Piper Ranch was undercapitalized, was controlled exclusively by the Schelhorns, and acted only as a financial conduit for the Schelhorns. *Id.* at 375-76.

The Idaho Supreme Court ruled that such facts were insufficient to establish "a unity of interest" to support a finding of an alter ego status. *Id.* Instead, the court held that such evidence demonstrated "*a distinction* between the personalities of the Schelhorns and Piper Ranch [LLC]." *Id.* at 377. (Emphasis supplied.) Among other things, the Piper Ranch bank account

---

[6] The action was brought by the developer, Wandering Trail, LLC, and its managing member, Liquid Realty Company. For ease of discussion, the plaintiffs will be referred to in the singular, as the "developer" or "plaintiff."

[7] The assignment agreement detailed that Piper Ranch, LLC would perform paving work for the Wandering Trails development in exchange for a 25% ownership interest in Wandering Trails, LLC. *Id.* at 372, n.1.

had checks in *only* Piper Ranch's name, there was no evidence that the Schelhorns deposited their own money into that account other than to meet capital obligations, and there was no evidence that either of the Schelhorns used Piper Ranch money to pay their own obligations.[8] *Id.* Further, the Schelhorns had insisted that the assignment agreement run between the developer and Piper Ranch - not between the developer and the Schelhorns individually. *Id.*

As to the instant case, Plaintiffs rely on facts very similar to those which fell short in *Wandering Trails.* Here, Plaintiffs rely upon the fact that the Bank was the only member of West Sprague, LLC, and they contend that the Bank exercised full control over West Sprague. But, under Idaho law, the fact that a separate entity is the only member of an LLC entity and exercises full control of the LLC is "not a relevant inquiry" for determining alter ego. *Id.* at 377.[9] Indeed, the court went on to say the plaintiffs' "argument, if accepted, would effectively eviscerate the legislative intent that member-managed and individual LLCs are separate legal entities." *Id.* Significantly, in the trial of this case, Defendants put on evidence that West Sprague had separate financial statements, separate income statements, its own general ledger accounts, and a separate federal tax ID number. *See* Oberst Testimony, Dkt. 420, 81:1-82:4.

---

[8] The state trial court in the underlying action had also emphasized that the Schelhorns maintained a separate bank account for the LLC, the LLC filed its tax returns in a manner acceptable to the IRS, and the Schelhorns and the LLC kept separate accounts. *Id*. at 375.

[9] The *Wandering Trails* decision also described that Idaho statutory law provides that the debts, obligations, or other liabilities of a limited liability company are *solely* the debts, obligations or liabilities of the company and do *not become* the debts, obligations, or liabilities of a member or manager solely by reason of the member acting as a member or manager acting as a manager. Idaho Code § 30-6-304 (emphasis added). *Id*. at 376-77.

Such factual indicia of economic separateness are identical in all relevant manner to the facts relied upon by the court in *Wandering Trails*. *Id.* at 375.

Moreover, in order to establish an alter ego there must be an inequitable result that would follow if the entities were not treated as the same. In general terms, this means that observing the separate entities would "sanction a fraud or promote injustice." *See Maroun v. Wyreless Sys., Inc.*, 114 P.3d 974, 986-87 (Idaho 2005). The fact a creditor may be unsatisfied is not proof alone of an injustice warranting piercing the corporate veil. *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977). Relatedly, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation and citation omitted). Only in exceptional cases do such bright lines give way, such as if fraud or injustice would result if the corporate form was not disregarded. *Seymour v. Hull & Moreland Engineering*, 605 F.2d 1105, 1111 (9th Cir. 1979). "To warrant casting aside the legal fiction of distinct corporate existence . . . it must [ ] be shown that there is such a unity of interest and ownership that the individuality of such corporation and such person had ceased; and it must further appear from the facts that the observance of the fiction of separate existence would, under the circumstances, sanction a fraud or promote injustice." *Hayhurst v. Boyd*, 300 P. 895, 897 (Idaho 1931).

Accordingly, in keeping with these general principles measured against the facts presented in this case, and construing the facts most favorable to the non-moving party under Rule 50, Plaintiffs' motion for judgment as a matter of law on the issue of alter ego is denied.

**D.      Jury Instruction No. 37 Is a Correct Statement of Applicable Law on Assumption by Implication of a Contract Liability.**

Plaintiffs contend that Jury Instruction No. 37 erroneously instructed on the law applicable to Plaintiffs' claim of assumption by implication.  In particular, Plaintiffs complain of the language which reads "assumption by implication occurs when the assignee's conduct manifests an intent to be bound to such duty or obligation."  Jury Instruction No. 37, Dkt. 382, p. 18.  Plaintiffs argue the language should be: "the assignee of an executory contract is not liable on the contract in the absence of an express assumption of the obligations *of the contract*." Pls.' Mem., Dkt. 416, p. 13 (emphasis in original).

Plaintiffs argue that without the words "of the contract," the instruction was ambiguous because the jury would have been required to decide whether "Defendants intended to assume the membership deposit refund liability, rather than requiring the jury to determine if the Defendants' conduct showed an intent to assume the assigned Membership Agreement."  *Id.* at 13-14.

Plaintiffs draw upon *Hardinger v. Fullerton*, 5 P.2d 987, 989 (Wash. 1931), which held that "the assignee of an executory contract is not liable on the contract in the absence of an express assumption of the obligations of the contract . . ."  Pls.' Mem., Dkt. 416, p. 13; *see also* Summary Judgment Decision, Dkt. 177, p. 28.  *Hardinger* draws upon a treatise for the proposition that a "purchaser is not liable for the payment of an encumbrance unless he has expressly or impliedly agreed to pay the same, and a mere recital that the property is sold subject to an encumbrance is not sufficient to create a personal liability."  *Hardinger*, 5 P.2d at 990 (internal quotation omitted).  The focus of *Hardinger*, however, was upon a particular liability

(as would sensibly be so), and the Washington Supreme Court specifically affirmed the trial court's ruling that the evidence of an "*assumption of the indebtedness*" was not sufficiently strong and convincing and that there was no implied assumption established. *Id.* (Emphasis added). The Court's instruction here was entirely consistent with this holding, in that assumption by implication of a particular duty or obligation requires that the conduct show an intent to be bound to such a duty or obligation.

Hence, the Court is not persuaded by Plaintiffs' contention. The Court extensively examined the applicable law on this subject (which, as with many other issues, was the subject of widely divergent positions from the parties[10]) prior to instructing the jury and the instruction was carefully and precisely framed to state the applicable law. Additionally, this Court relied upon *Northern Pac. Ry. Co. v. Sunnyside Val. Irrigation Dist.*, 527 P.2d 693, 695 (Wash. App. 1974) (reversed on other grounds) ("*Sunnyside*") and *Dahlhjelm Garages v. Mercantile Ins. Co. of Am.*, 270 P. 434 (Wash. 1928). The *Sunnyside* court spells out the particulars of the claim in holding that a third person to the original contract may:

> [A]ssume the *obligation* expressly in writing, or he may do so *by implication where his conduct manifests an intent to become bound . . . In the latter event all the circumstances must be considered*, such as the subject matter of the contract, the third person's acts and words, whether he acquiesced in the terms of the contract, performed its obligations, or accepted its benefits.

---

[10]  By way of example, *see, e.g.*, Plaintiffs' Proposed Jury Instructions, Dkt. 304, pp. 34-35; Defendants' Proposed Jury Instructions, Dkt. 297, p. 19. *See also* Defendants' Supplemental Proposed Jury Instructions, Dkt. 351, pp. 2-3, 12-13. Indeed, Defendants proposed not just one, but two (different in form), instructions on this subject.

*Sunnyside*, 527 P.2d at 695 (emphasis added).  Consistent with the Washington court's holding years earlier in *Hardinger*, the *Sunnyside* decision makes clear that the assignee's conduct must show an intent to be bound by the *obligation.*

Additionally, the decision in *Dahlhjelm Garages* traces the same template, in describing "the general rule . . . that the assignment of a contract does *not* cast upon the assignee the liabilities imposed by the contract on the assignor.  But the rule is not absolute.  The assignee cannot enforce the contract against the other party thereto without performing, or showing a performance, of the obligations which the contract imposes."  270 P. at 436 (emphasis added). *Accord*, *McGill v. Baker*, 266 P. 138, 139, 141 (Wash. 1928) (assignment alone does not bind assignee to carry out contract).

Plaintiffs argue that the Court ignored purported black letter law that "an assignee stands in the shoes of the assignor," pointing to *Paullus v. Fowler*, 367 P.2d 130, 135 (Wash. 1961). The Court did indeed draw upon this decision in its order on the cross-motions for summary judgment (Dkt. 177 at 27 citing *Paullus v. Fowler*, 367 P.2d 130 (Wash. 1961)), but did so in considering the complete holding, which contains this additional language Plaintiffs fail to mention:  "For executory contracts, such as the Membership Agreement, the general rule includes the proviso that the assignee is only liable on the underlying obligations if there is an express assumption of those obligations."  Dkt. 177, p. 28 (citing to *Hardinger v. Fullerton*, 5 P.2d 987, 989 (Wash. 1931) (internal footnotes omitted)).[11]  This fuller statement of the correct

---

[11]  The Ninth Circuit recognized that this "standing in the shoes" statement alone from *Paullus* is not a complete statement of Washington law.  After citing this "black letter law" from *Paullus*, the Ninth Circuit went on to state: "[t]rue, but under Washington law 'an assignee in an executory contract is not liable on the underlying obligations absent an express assumption of

law further undergirds the Court's drafting of Jury Instruction No. 37, related jury instructions, and the special verdict form.

Plaintiffs also invoke the decision in *Fiberchem v. General Plastics Corp.*, 495 F.2d 737 (9th Cir. 1974), but that effort is clearly misplaced. *Fiberchem*, an unjust enrichment case, does not rely on Washington law for the propositions claimed by Plaintiffs. *See* Pls.' Mem., Dkt. 416, pp. 16-17. Plaintiffs quote that "an assignee takes his claim subject to the equities of third persons against the assigned right where he has knowledge of such equities." *Id.* at 738. That statement, however, was not drawn from Washington law. Rather, the *Fiberchem* court drew upon a Pennsylvania case, several treatises, and a law review article, all in wrestling with an unjust enrichment claim. *See id*. This Court, therefore, did not ignore *Fiberchem*. Instead, as the Court has described in prior decisions in this case, the *Fiberchem* decision is inapposite to this case and, regardless, the *Fiberchem* court was not relying upon Washington law.

Lastly, Plaintiffs contend the Court should not have used the word "and" in the list of factors contained at the end of Jury Instruction No. 37. Plaintiffs contend that by using "and" the Court created a "misleading super-standard of proof." *See* Pls.' Mem., Dkt. 416, p. 16.

This particular section of Instruction No. 37 reads:

> In deciding whether an assignee's conduct manifests an intent to be bound by such duty or obligation, you are to consider the conduct of the assignee in totality, including:
>
> •     all circumstances surrounding the assignment of the contract;
> •     the events occurring in relation to the assigned contract;

those obligations.'" *Johnson v. Fed. Home Loan Mortgage Corp.*, 793 F.3d 1005, 1008 (9th Cir. 2015) (discussing *Paullus v. Fowler* and citing to *Lewis v. Boehm*, 947 P.2d 1265, 1270 (Wash. App. 1997)).

- the subject matter of the contract;
- the assignee's acts and words;
- whether the assignee acquiesced in the terms of the assigned contract;
- whether the assignee performed its obligations; and
- whether the assignee accepted its benefits.

Dkt. 382, p. 18.

Plaintiffs contend that proof of *any* of the last three of the listed items (acquiesce in terms of contract, perform its obligations, accept its benefits) creates liability under an express assumption by implication theory. *See* Pls.' Mem., Dkt. 416, p. 16. However, that is an inexact and incorrect statement of what the law requires the jury to consider. It bears repeating here the language of *Sunnyside*, which describes the circumstances by which the assignee can be said to have assumed a contract obligation – whereby the assignee may:

> [A]ssume the *obligation* expressly in writing, or he may do so *by implication where his conduct manifests an intent to become bound . . . In the latter event <u>all</u> the circumstances <u>must</u> be considered*, such as the subject matter of the contract, the third person's acts and words, whether he acquiesced in the terms of the contract, performed its obligations, or accepted its benefits.

*Sunnyside*, 527 P.2d at 695 (emphasis added).

Accordingly, the list of items contained as part of the larger whole of Jury Instruction 37 is not a list of elements to be satisfied. Rather, it is a list of different types of conduct for the jury to examine in "considering the conduct of the assignee in totality." There is nothing of a "super standard" of proof in that language, or in the use of the word "and." Nor is there any impediment to the party seeking to prove an assumption by implication claim, through whatever measure of those various subjects the party may seek to emphasize. The applicable law requires the jury to consider the conduct of the assignee in totality, and the instruction given by the Court is the *mot juste* called for by the applicable law.

**DECISION AND ORDER ON RULE 50 AND 59 MOTIONS - 16**

Further, and importantly, the correct statement of the applicable law as contained in Jury Instruction No. 37 did not preclude Plaintiffs from arguing their position that proof of any of the last three elements would support a verdict in their favor. It was, of course, Plaintiffs' burden to persuade the jury that Plaintiffs' view of the totality of the conduct supported Plaintiffs' theory of assumption by implication. The manner in which the jury was correctly instructed did not interfere in any way with Plaintiffs' ability to emphasize certain factors, ask the jury to discount or disregard other of the factors, or otherwise argue the persuasiveness of the relevant evidence as to any or all of the listed factors. Hence, the Plaintiffs' argument in this regard is not well made. The Court correctly instructed the jury on the applicable law pertaining to the theory of an assumption by implication.[12]

Accordingly, Plaintiffs' renewed motion for judgment as a matter of law on the issue of liability is denied. In the exercise of the Court's discretion consistent with the standards imposed by Rule 50, the Court concludes that the evidence during trial left more than one reasonable conclusion. Therefore, the Court should not and will not conclude that it would have

---

[12] Plaintiffs also take issue with the special verdict form but do not make a specific argument as to how it is erroneous other than to loosely contend that the verdict form "overly misstate[s] the law by requiring the jury to specifically find that Defendants expressly assumed the membership deposit refund liability." Pls.' Mem., Dkt. 416, p. 15. Likewise, Plaintiffs' Formal Objection to the Court's Final Jury Instructions, filed on the stipulated date of March 31, 2016, states that the special verdict is in error because it: (1) improperly states the law and is misleading and unnecessarily confusing; (2) does not track what a correct set of jury instructions would include; (3) requires decisions on issues previously decided as a matter of law or for which no proof was presented during trial; and (4) mishandles the issue of stipulated damages, mitigation, and setoff. *See* Plaintiffs' Formal Objections to Final Jury Instructions, Dkt. 391, p. 22. Such arguments are more vague and conclusory than not, and the Court's denial of the motion to the extent that it is premised upon the arguments set out in the "Formal Objection" regarding the special verdict form is made upon the reasons set out elsewhere in this decision, as they are part and parcel.

been proper to take the case away from the jury prior to deliberations, or to instruct as a matter of law upon the specific issues raised by Plaintiffs here, or to enter judgment in favor of Plaintiffs before giving the case to the jury, or to do so after the verdict was returned. The Court should not and will not undo the jury's ultimate verdict in favor of Defendants.[13]

## MOTION FOR NEW TRIAL/Fed. R. Civ. P. 59

**A.      Standard**

Rule 59(a) permits a new trial on all or some of the issues, and to any party, "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Rule 59 is not specific as to the grounds on which a new trial may be granted; instead "the court is bound by those grounds that have been historically recognized." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal citation and quotation omitted). In the Ninth Circuit, such "grounds include, but are not limited to, claims that the verdict is against the weight of evidence, that the damages are excessive or that, for other reasons, the trial was not fair to the party moving" *Id.* (Internal quotation and citation omitted).

Thus, "[u]pon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where in [the court's] conscientious opinion, the verdict is contrary to the clear weight of evidence." *Id.* (Brackets in original, internal quotation marks and citation omitted.) The decision as to whether to grant a new trial is discretionary. *MHW Financing Ltd. Partnership v. City of San Rafael*, 714 F.3d

---

[13]  Because of the Court's rulings on the issue of liability, arguments made by Plaintiffs regarding damages and set-off are moot. *See* Pls.' Mem., Dkt. 416, pp. 19-20.

1118, 1132 (9th Cir. 2013). Further, "because determining the clear weight of evidence is a

fact-specific endeavor, appeals courts are reluctant to second-guess district courts' conclusions."

*Molski*, 481 F.3d at 729 (internal quotation and citation omitted). However, a new trial may be

granted "only if the verdict is contrary to the clear weight of the evidence, is based upon false or

perjurious evidence, or to prevent a miscarriage of justice." *Id.*

**B.      The Jury's Verdict Was Not Against the Clear Weight of Evidence**

Plaintiffs contend that the jury's verdict was contrary to the clear weight of evidence and

that, "given the erroneous jury instructions[,] it was not possible for the jury to ever come to the

correct decision on the assumption issue." Pls.' Mem., Dkt. 416, p. 25, n.55. The Court has

already addressed Plaintiffs' contentions in regard to Jury Instruction No. 37, and those issues

will not be repeated here other than to say the Court's ruling in the context of a Rule 59 motion

would be the same as on the Rule 50 motion.[14] The Court properly instructed on the law of

assumption by implication.

As to Plaintiffs' argument that the jury's verdict was contrary to the clear weight of

evidence, the Court has made its own conscientious assessment of the proof and arguments

offered at trial, as well as the briefing and related materials filed in connection with the post-trial

motions. The assessment of whether a jury's verdict is "contrary to the clear weight of

evidence" is inescapably a "fact-specific endeavor." *Molski*, 481 F.3d at 729. The evidence and

testimony during trial described a series of events and inferences that could be drawn from the

---

[14] Plaintiffs spend little time on this aspect of their motion other than to state that "[e]rroneous jury instructions, as well as failure to give adequate instructions, are grounds for a new trial unless the error is harmless . . . [t]he errors made at trial here were not harmless so a new trial is warranted." Pls.' Mem., Dkt. 416, p. 26.

actions and inactions leading up to the DIL, the DIL itself, and events subsequent to the DIL (including the termination of membership agreements) which could be viewed a number of ways depending on the weight and credibility given to the document evidence and testimony of the witnesses.

The parties presented remarkably different cases to the jury. Although at most times, the mien of counsel was professional and courteous, the litigation and trial of this case also was marked by contention and acrimony. The manner in which the evidence came in and the arguments were made was often antagonistic. Lead counsel spent an extraordinary amount of time and effort during trial attempting to demonize the opposing parties and sometimes each other. Mr. Springel's examination of Bank witnesses and arguments about their actions sought to cast the Defendants and their officers as bad, even criminal, actors in making multiple loans to Marshall Chesrown because the Bank purportedly knew the Club operated at a loss and was never going to make a profit. *See, e.g.,* Perko Testimony, Dkt. 419-2, 110:15-22, 111:1-4, 112:1-23. In his closing argument, Mr. Springel characterized the relationship between Chesrown and the Bank as akin to a criminal conspiracy and stated that the Bank was out for itself because "banks aren't very nice." Pls.' Closing, Dkt. 420-3, 25:25, 27:15-17, 28:1-4. Mr. Springel also analogized the actions of the Bank in foreclosing on the Club and its impact upon the Plaintiffs as equivalent to a person driving under the influence and killing someone. *See* Oberst Testimony, Dkt. 420, 202:19-206:18; Pls.' Closing, Dkt. 420-3, 29:12-22. Defendants' counsel Mr. Dunn likewise spent considerable time during trial disparaging and demonizing Plaintiffs. He labeled Plaintiffs as arrogant, rich "country club golfer gamblers," motivated by greed and trying to avoid any personal responsibility for their decisions. *See, e.g.,* Defs.'

**DECISION AND ORDER ON RULE 50 AND 59 MOTIONS - 20**

Closing, Dkt. 420-3, 65:19-24, 66:3-20, 76:14-21; Defs.' Opening, Dkt. 418-1, 179:13-16, 179:23-26, 182:9-19.   During the examination of the Plaintiffs, Defendants' counsel focused on the Plaintiffs' purported wealth, claimed that they lived in gated communities in other states, and flew on private planes.  *See, e.g.*, Sean Rivera Testimony, Dkt. 420-1, 80:7-12; Cayne Testimony, Dkt. 420-1, 121:18-122:8, 141:11-15, 148:7-12; Ronnie Rivera Testimony, Dkt. 420-1, 235:12-236:2, 237:15-238:4, 239:25-240:24.

The palpable disdain between Mr. Springel and Mr. Dunn, and of various of the Bank's officers toward Plaintiffs and Plaintiffs' counsel (and vice versa), as reflected in the presentation of the evidence, testimony of witnesses, cross examination of opposing witnesses, and the arguments, often overshadowed and arguably shortchanged the presentation of evidence on the most significant issue for trial - *i.e.*, whether there had been an assumption by implication.  The resulting contentious contours of the case might well have been the result of the trial strategies of the respective parties, each seeking somehow to make the jury believe that its verdict should favor one side over the other based on moral compulsion or culpability, or lack of integrity and character.

Ultimately, however, it is the case as presented in the courtroom, not the case as it might have been presented, that the Court must consider.  In that lens, the Court concludes that the jury's verdict was not contrary to the clear weight of evidence.  Over the course of the two-week trial, the vast and varied evidence which was introduced did not funnel into a conclusion that the jury arrived at a "seriously erroneous result."  *See Johnson*, 251 F.3d at 1229.  For instance, Club Manager Andy Gorton testified that, following the DIL, he continued to work in the same manner as he always had, seldom conversed with Bank employees, and that in his view the Bank

appeared to have no intention of running the golf course. Gorton Testimony, Dkt. 418-3, 38:16-19, 86:17-87:6; Dkt. 418-2, 93:22-94:2. The Club at Black Rock, LLC's Chief Financial Officer, Chad Rountree, testified that after the DIL he did not believe he was working for either the Bank or West Sprague in continuing to do his duties. Rountree Testimony, Dkt. 419-1, 75:23-76:5. Ms. Shiflett, the consultant hired by West Sprague to advise on how to manage cash flow to "preserv[e] the asset," testified that she only met with Club manager Gorton once or twice during the months that she was working with West Sprague. Shiflett Testimony, Dkt. 418-2, 269:3-14 She was never authorized to cut checks or negotiate payments with vendors. *Id*. at 270:16-22. She had no authority to hire or fire employees and did not have any involvement in club memberships, such as billing club members for their dues or suspending them if they did not pay their dues. *Id*. at 270:24-271:6, 272:8-273:9. Bank officers who testified at trial, including Bank President Jack Heath and Dean Oberst, testified that the Bank absolutely did not intend to take on *any* liabilities, but rather was only taking the real estate and associated assets of the Club. Heath Testimony, Dkt. 419-3, 115: 10-14, 122:15-16; Oberst Testimony, Dkt. 420, 17:2-4. Marshall Chesrown, the managing member of the Club at Black Rock, LLC, testified that he believed the Bank was acquiring only the "assets that secured the note" and was aware that he "still had the liability via the Club at Black Rock, LLC." Chesrown Testimony, Dkt. 420-2, 125:22-126:3, 184:14-15.

While there was certainly a basis and an opportunity to conclude that such evidence should not be accepted over the counter evidence and arguments presented by Plaintiffs, that is not the choice the jury made. In this space, Plaintiffs' arguments are the same arguments made in pretrial motions and at trial. Whether Defendants, through their actions, assumed the

membership deposit refund liability was disputed and the jury's decision was drawn from the weight and credibility given by the jurors to the evidence and testimony at trial. The decision was highly fact-intensive. Ultimately, the verdict revealed that the jury gave more persuasive weight to the Defendants' evidence and arguments, than to Plaintiffs' evidence and arguments.

While there were facts and inferences to be drawn from such facts that supported both sides, the jury favored Defendants. The Court finds, in the exercise of its discretion, that the verdict was not contrary to the clear weight of evidence and thus, will not disturb the verdict.

**C.     There Were No Errors in the Jury Instructions**

Plaintiffs contend errors in the jury instructions warrant a new trial. Here again, Plaintiffs attack Jury Instruction No. 37 which the Court has already addressed and the Court will not do so again here.[15] In addition, Plaintiffs complain about the time line of the jury instructions, including when jury instructions were submitted by the parties, the Court's discussion at pretrial conferences concerning the jury instructions, the jury instruction conference, and the Court's contact with counsel regarding the final jury instructions the evening before and the morning of closing arguments. *See* Pls. Mem., Dkt. 416, pp. 26-31.

Plaintiffs contend that had they received final jury instructions at an earlier date, particularly what became Jury Instruction No. 37, they would have the chance to "timely brief the errors . . . and may have completely avoided the necessity of these motions." Pls.' Mem., Dkt. 416, p. 27. To the extent that Plaintiffs' counsel implies that the Court was sitting idly by during the course of trial, they know better. During the course of trial, counsel for both sides

---

[15] This also goes for any argument regarding the special verdict form. *See*, *supra*, note 12.

filed numerous bench briefs and trial briefs.[16]  Additionally, during trial and particularly toward

the close of trial, both sides continued to file proposed jury instructions for the Court to

consider.[17]  Ultimately, Plaintiffs submitted 38 proposed jury instructions and Defendants

submitted 59.  The Court worked diligently to consider and resolve everything that needed to be

addressed during the course of the trial, including consideration of the parties' seriatim ongoing

efforts to buttress the written record on various continuing disagreements about the applicable

law and as to proposed jury instructions.

Further, Plaintiffs mischaracterize the relevant events of what transpired during the trial.

Plaintiffs say that Mr. Springel "advis[ed] the Court that a reasonable time period to object to,

and get the jury instructions right, would have been over the weekend . . ."  Pls.' Mem., Dkt.

416, p. 30.  From that, one might assume that Plaintiffs objected to going forward with closing

arguments on the last day set for trial – Friday, March 18, 2016.  But Plaintiffs never made such

a request.  Instead, the record referenced by Plaintiffs describes the Court's willingness to allow

---

[16]  Specifically, Plaintiffs filed nine motions/trial briefs during the trial (Dkts. 331, 345, 346, 348, 350, 367, 369, 375, 377) and Defendants filed ten briefs/motions of their own or responses/objections to Plaintiffs' trial briefs (Dkts. 336, 353, 354, 355, 356, 357, 358, 368, 376, 378).  The parties also filed multiple supplemental jury instructions and objections to jury instructions during the course of trial (Dkts. 330, 340, 341, 347, 349, 351, 366, 371).

[17]  In weighing Plaintiffs' complaint about being aggrieved over the timing of when they received the Court's final jury instructions, the Court is mindful that there is no pattern jury instruction on the issue of implied assumption.  The jury instructions on implied assumption proposed by the parties prior to trial were in stark contrast to one another – skewed, as one would expect, to the divergent views each side had about what the law required for proof of such a claim.  *See, e.g.*, Plaintiffs' Proposed Jury Instructions, Dkt. 304, pp. 34-35; Defendants' Proposed Jury Instructions, Dkt. 297, p. 19.  Defendants later submitted supplemental proposed jury instructions, including ones on implied assumption, but this occurred during trial (March 13, 2016).  *See* Defendants' Supplemental Proposed Jury Instructions, Dkt. 351, pp. 2-3, 12-13.

the parties to make their on-the-record objections to the final jury instructions after, rather than before, closing arguments, so that counsel could focus on preparing for their closings later on that Friday date. The complete transcript of that hearing (Dkt. 421) shows that it is that later deadline – after closing arguments – for counsel to file *written objections* to the jury instructions in order to preserve any objections, that was being discussed by the Court and counsel. *See* Dkt. 421, 17:17-22, 18:12-19, 19:1:24, 21:5-25. The Court asked if the parties preferred to stipulate "that a written set of objections could be filed after trial." Defense counsel agreed to stipulate to formalizing written objections in that manner, and the Court then inquired about what might be a reasonable deadline for such objections to be filed, after trial. Mr. Springel said, "I think it could be done over the weekend. I would like to take my vacation if it's not a race, we could do....Until the end of the month." Dkt. 421, 19:4-11. Counsel then stipulated to a deadline of March 31, 2016, for submission of written objections, and the Court then inquired of counsel whether counsel had any "particular things" regarding the jury instructions that they were "concerned about of immediacy," that is, that same Friday morning, before the jury was instructed later that same day. *Id.* at 19:21-24. Mr. Springel then raised his concern about Jury Instruction No. 37, which the Court heard at that time. After noting this objection, Mr. Springel, more generally, stated that: "I believe it's 37 and I don't have any other concerns." Dkt. 421, 21:21-22.

There was no objection from Plaintiffs about going forward that day, or any request to seek to delay closing arguments until the following week. As noted in the reference to the record set out above, Plaintiffs' counsel had a family vacation already in place for the following week. Plaintiffs' arguments for a new trial on these grounds – Jury Instruction No. 37 and the timeline

of jury instructions – do not warrant a new trial under Rule 59, and Plaintiffs' motion on these grounds is denied.

## D. The Conduct of Defendants' Counsel, Mr. Dunn, Does Not Warrant a New Trial

Plaintiffs contend that Mr. Dunn engaged in misconduct that requires a new trial. Plaintiffs contend Mr. Dunn's "continuous, improper and prejudicial references to the Plaintiffs' economic status, *e.g.*, constant references to the members as 'country club golfers,' thoroughly permeated the trial from the outset in an improper attempt to distract from the overwhelming relevant evidence demonstrating Defendants' liability by characterizing Plaintiffs as wealthy individuals not deserving of having their contracts honored." Pls.' Mem., Dkt. 416, p. 34.

It is correct that misconduct by trial counsel may justify a new trial if the "'flavor of misconduct sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict.'" *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1192 (9th Cir. 2002) (quoting *Kehr v. Smith Barney*, 736 F.2d 1283, 1286 (9th Cir. 1984)); *see also Settlegoode v. Portland Public Schools*, 371 F.3d 503, 517 (9th Cir. 2004). In evaluating any possible prejudice from attorney conduct, the Court considers "the totality of the circumstances including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and verdict itself." *Hemmings*, 285 F.3d at 1193 (citation omitted). "[T]he trial judge is in a superior position to evaluate the likely effect of the alleged misconduct and to fashion an appropriate remedy." *Id*.

In the *Kehr* case, defendants objected to "prejudicial acts of misconduct" by plaintiff's attorney that included (1) indulging in criminal imagery; (2) commenting on financial disparity

between the parties; (3) dwelling upon irrelevant subjects; (4) conducting himself with a lack of decorum; and (5) making unsubstantiated accusations of tampering with documents against defendant and its counsel. *Kehr*, 736 F.2d at 1285. The court found that the such comments were improper, but the district court properly denied a new trial because the offending remarks occurred mostly during opening statement and closing argument, opposing counsel never objected during closing argument or moved for a mistrial and the jury's award of damages was not excessive. *Id*. at 1286. "[G]iven that the trial court is in a far better position to gauge the prejudicial effect of improper comments than an appellate court which reviews only the cold record, we conclude that the district court did not abuse its discretion in refusing to grant a new trial." *Id*.

In contrast, in *Bird v. Glacier Elec. Coop., Inc.*, 255 F.3d 1136 (9th Cir. 2001), closing arguments did offend fundamental fairness where counsel: (1) argued in inflammatory terms; (2) linked the defendant to white racism in the exploitation of Indians; (3) appealed to historical racial prejudice of, or against, the white race; and (4) used incendiary racial and nationalistic terms to encourage the all-tribal member jury to award against the non-Indian defendants. *Id*. at 1152.

Plaintiffs contend that Mr. Dunn made 34 improper references during his opening statement. Pls.' Mem., Dkt. 416, p. 36. Plaintiffs objected to these statements following opening statement and the Court heard argument at the end of the trial day. After doing so, the Court issued a written order and gave a curative jury instruction to the jury later in the trial that stated, in part:

> There was reference in Defendants' opening statement to 'country club golfers' and other references which may have been intended to leave an inference as to the economic status of one or more of the Plaintiffs. There has been other reference, by both parties, during the trial presentation in the first several days as to other subjects which may have been intended to leave an inference to the economic status of one or more of the Plaintiffs, and to one or more of the Bank's officers. The court has previously instructed you in Instruction No. 16, which reads: 'All parties are equal before the law and a corporation or limited liability company is entitled to the same fair and conscientious consideration by you as any party. The statement that 'all parties are equal before the law' means just that.

Jury Instruction No. 20, Dkt. 342.

As referenced in the Court's curative instruction, the jury was instructed at the start of the trial in pre-proof Jury Instruction No. 16, that: "All parties are equal under the law and a corporation or limited liability company is entitled to the same fair and conscientious consideration by you as any party." Dkt. 343, p. 21. The jury was also instructed that "[a]rgument and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, [will say in their] closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence." *Id*. at p. 10. These instructions provided the jury the framework for what is, and what is not, evidence.

Next, Plaintiffs argue that despite these jury instructions and despite the Court's pretrial ruling regarding the Golden Rule,[18] Mr. Dunn continuously made prejudicial comments throughout the course of the trial. Plaintiffs especially take issue with the "personal, *ad*

---

[18] In ruling on one of Defendants' motions in limine, the Court ruled that "[t]he general admonition against an attorney, for whatever party, asking jurors to put themselves in the shoes of any of the parties to the case, in whatever form that might take, applies to this case in the same measure as it would in any other trial . ." Order, Dkt. 294.

*hominem*" attacks on Plaintiffs made during closing argument, including that Plaintiffs were "rich country club golfer gamblers" "with an attitude of arrogant entitlement" "that bet on the economy" "who obviously have a lot of disposable income to spend" and "decided to gang up on a community business and do so in a fashion that wasn't keeping with the rules of the sandbox." *See* Pls.' Mem., Dkt. 416, p. 37 (citing Defendants' closing argument). Plaintiffs contend that Mr. Dunn's "rampage" continued for 91 minutes and the "Court did not stop [it] or give any further curative instruction after closing arguments or before the jury deliberated." *Id.*

In response, Defendants point out that Plaintiffs asserted only one objection during closing argument and that objection was unrelated to the arguments that Plaintiffs now claim were misconduct. Additionally, Defendants point out that Plaintiffs (and Defendants) were given the opportunity to raise any additional and/or remaining issues with the Court after closing arguments, outside the presence of the jury, and Plaintiffs failed to raise any objections to the misconduct of which it now complains. *See* Defs.' Resp., Dkt. 448, p. 30.

Federal courts "erect a 'high threshold' to claims of improper closing arguments in civil cases raised for the first time after trial." *Hemmings*, 285 F.3d at 1193 (quoting *Kaiser Steel Corp. v. Frank Coluccio Constr. Co.*, 785 F.2d 656, 658 (9th Cir. 1986)). "The rationale for this high threshold is two-fold. First, raising an objection before the jury begins deliberations permits the judge to examine the alleged prejudice and to admonish . . . counsel or issue a curative instruction, if warranted" and "[t]he second rationale stems from the courts' concern

that allowing a party to wait to raise the error until after the negative verdict encourages that party to sit silent in the face of claimed error." *Id*. (internal citation and quotation omitted).[19]

The Plaintiffs did complain of defense counsel's characterization of Plaintiffs as "rich country club golfers" following opening statements, but the Plaintiffs made no mention or objection to these statements during Defendants' closing statement, or immediately thereafter, or outside the presence of the jury. The Court responded to Plaintiffs' objection following opening statement and gave the jury a curative instruction, similar to a pre-proof instruction, that all persons are equal before the law, regardless of economic status. However, Plaintiffs likewise sought to pull an emotional lever of wealth and privilege in this case, as Plaintiffs' entire case was steeped with the theme that an arrogant, enormously wealthy banking institution cared only about its profits to the great detriment of Plaintiffs. In his closing rebuttal argument, Mr. Springel flipped Mr. Dunn's closing around, saying, "I think we all know where the arrogance lies in this room and where the impunity lies in this room," then asking rhetorically of the jury as to where was the "personal accountability for Washington Trust Bank" who "took a lousy loan [and] took it out on innocent people here." Pls.' Closing, Dkt. 420-3, 116:20-21, 121:10-14.

Mr. Dunn spent very little time in his closing argument discussing the evidence of the

---

[19] In *Hemmings*, defendants objected to several statements of plaintiffs' attorney made during closing arguments. *Id*. at 1192. These included a statement that defendant (Tidyman's) had been sued before for discriminatory policies in the past, including by plaintiffs' attorney himself. *Id*. at 1192. Plaintiffs' counsel also stated that the defendants' case was a "jack rabbit defense," that a verbal assault on an employee was "rape of her mind," and that a female board member and a paralegal sitting at counsel table were mere "tokens." *Id*. at 1192, n.21. The court upheld the district court's denial of a new trial because the misconduct was not prejudicial or fundamentally unfair. *Id*. at 1193. The court also noted that defense counsel had made similar statements, *e.g.*, referring to plaintiffs' case as a "bag of rabbits" because their case had no merit. *Id*. at 1192, n.21.

case, and much more time talking about Plaintiffs as wealthy, out-of-towners who didn't deserve a verdict in their favor. His arguments were clearly intended to urge the jurors to chose sides, and view the evidence with that choice in mind. Whether such a trial strategy is successful is not capable of precise measurement. One could say as easily that such a strategy was fraught with the risk of leaving behind an emphasis upon the evidence most favorable to the defense of Plaintiffs' claims, and thus exposing his client to a greater risk of an adverse verdict. However, the Court places a great deal of trust in the jurors' ability to focus on the evidence, as opposed to the hyperbole and sometimes inflammatory rhetoric of the attorneys, when reaching their verdict. In that regard, it may well be that the jury reached its verdict in favor of Defendants despite the disconnected nature of Mr. Dunn's closing argument, not because of it.

In this case, there were instances of conduct and argument from *both* sides which ran afield from a pure focus on the evidence. There is no doubt that such actions by counsel were intended to color the jury's view of the evidence in some way to suggest that the equities of their decision ought to rest with one side or the other. That is nothing new in the trial arena, although it was of a particularly heightened and sometimes abrasive nature in this case, from both camps. However, the Court carefully observed the jury throughout the trial, and is confident that the jurors were attentive to their responsibilities and were not deterred from those responsibilities because of high-pitched exhortations of counsel to think poorly of one party or the other. The Court remains convinced that the jury reached its verdict because of the evidence, in spite of and not because of any passion or prejudice sought to be ignited by any attorney's conduct. The Court's perspective in that regard also would be true if the jury had returned a verdict in favor of Plaintiffs.

**DECISION AND ORDER ON RULE 50 AND 59 MOTIONS - 31**

Ultimately, "the moving party must demonstrate [that] adverse counsel's misconduct . . . 'substantially interfered' with the moving party's interest." *S.E.C. v. Jasper*, 678 F.3d 1116, 1129 (9th Cir. 2012) (citing *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1405 (9th Cir. 1995)). In this case, the trial was not so tainted with misconduct that the jury was unduly influenced by passion and prejudice in reaching its verdict. The jury was instructed in pre-proof Jury Instruction No. 6 that "arguments and statements by lawyers are not evidence." The jury could determine that the arguments of counsel were just that. The jurors had before them evidence upon which they could base the verdict reached in this case. Moreover, the Court does not find the verdict itself yields any indication that the jury was improperly prejudiced by any misconduct by Defendants' counsel. Accordingly, the Court finds that any misconduct at trial did not so permeate the entire proceeding such that the jury was influenced by passion and prejudice in reaching its verdict in favor of Defendants.

//

//

//

//

//

//

//

//

//

//

**ORDER**

The Court has carefully considered all of the argument advanced by both sides and the relevant portions of the underlying record. In the exercise of the Court's discretion and consistent with the applicable law, the Court hereby ORDERS that Plaintiffs' Renewed Motion for Judgment as a Matter of Law,[20] or in the alternative, Motion for New Trial (Dkt. 415) is DENIED, for the reasons described herein.

DATED: **January 20, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

---

[20] This includes Plaintiffs' motion for judgment as a matter of law made during trial as discussed *supra*, p. 3.